**BOONVILLE CONVALESCENT CENTER, INC., Appellant–Plaintiff,**

v.

**CLOVERLEAF HEALTHCARE SERVICES, INC., Cloverleaf Healthcare of Boonville, Theodore E. Bruzas, Charline Bruzas, George A. Smith, Trela C. Smith, James L. Smith, Sharon K. Smith, William T. Rees, Helen L. Rees, Paul S. Hulse, Mihoko Hulse, Tim J. Shrout, Kimberly Shrout, Paul C. Ade, Ruth Ade, and Sherwood Healthcare Corp., Appellees–Defendants.**

**Cloverleaf Healthcare of Boonville, Appellee/Third–Party Plaintiff,**

v.

**Bruce H. Whitehead, Appellee/Third–Party Defendant.**

No. 32A05–0501–CV–9.

Court of Appeals of Indiana.

Sept. 30, 2005.

Rehearing Denied Nov. 23, 2005.

J. Gordon Gibbs, Jr., Hinkle & Gibbs, Danville, IN, Gene R. Leeuw, John M. Mead, Leeuw, Oberlies & Campbell, P.C., Indianapolis, IN, Attorneys for Appellant.

Thomas J. Costakis, Brian C. Fritts, Greg A. Small, Krieg DeVault, LLP, Indianapolis, IN, Robert A. Wood, Kendall, Wood, Lowry & Kessinger, Danville, IN, Morris C. Gore, Glast, Phillips & Murray, P.C., Dallas, TX, William O. Harrington, William O. Harrington, P.C., Danville, IN, Attorneys for Appellees.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Plaintiff, Boonville Convalescent Center, Inc. (Boonville), appeals the

trial court's findings of fact and conclusions of law granting damages against Appellees–Defendants/Appellees–Third–Party Plaintiff, Cloverleaf Healthcare Services, Inc. (CHS) and Cloverleaf Healthcare of Boonville (CHB) (collectively, Cloverleaf) and Appellee/Third–Party Defendant, Bruce H. Whitehead (Whitehead).[1]

We affirm in part, reverse in part, and remand with instructions.

## ISSUES[2]

Boonville raises four issues on appeal, which we restate as follows:

(1) Whether the trial court erred in concluding that rental adjustments under a twenty-year lease are governed by the paragraph fixing the term of the lease rather than the paragraph setting the rent;

(2) Whether the trial court erred by crediting Cloverleaf with rental charges never paid while at the same time not assessing Cloverleaf with the cost of utility and insurance expenses;

(3) Whether the trial court erred by concluding that the twenty-year lease, which had commenced on February 28, 1986, terminated on October 31, 2004; and

(4) Whether the trial court erred in its determination of attorney fees.

On cross-appeal, Cloverleaf raises one issue which we restate as follows: Whether the trial court erred in concluding that Cloverleaf is liable for maintenance costs under the lease agreement with Boonville.

The Appellee/Third–Party Defendant, Whitehead, raises six issues on appeal, which we consolidate and restate as the following two issues:

(1) Whether the trial court erred in concluding in its May 29, 2002 bifurcation Order that Whitehead would be bound by the trial court's findings of fact and conclusions of law even though Whitehead had timely filed a request for a jury trial; and

(2) Whether the trial court erred in concluding that our opinion in *Boonville Convalescent Center v. Cloverleaf Healthcare Services*, 790 N.E.2d 549 (Ind.Ct.App.2003), *reh'g granted, trans. denied* (*Boonville I*) is applicable to Whitehead even though Whitehead was not a party on appeal.

## FACTS AND PROCEDURAL HISTORY[3]

On February 28, 1986, Boonville CEO, Charles J. Ludwyck (Ludwyck) leased the Boonville Convalescent Center (the nursing home) to CHS, and its personal guarantors. The lease called for CHS, its co-signers, and its assignees/sublessees to

**1.** We hereby deny Whitehead's motion for oral argument.

**2.** Prior to discussing the issues, we need to rule on two motions.

First, on April 20, 2005, Whitehead filed a Motion for Extension of Time to File Brief. Two days later, Boonville filed its Verified Request to Clarify Parties and Objection to [Whitehead's] Motion for Extension of Time to File Brief. Upon review of these motions and the parties' briefs, we conclude that all briefs have been filed and the parties' respec-

tive status has been clarified. Accordingly, we find the motion to be moot.

Second, on July 18, 2005, Whitehead filed his Motion to Strike Portions of the Supplemental Appendix and Response Brief of [Boonville]. Thereafter, on July 29, 2005, Boonville filed its Response to Whitehead's Motion to Strike. We hereby deny Whitehead's Motion.

**3.** We are indebted to Judge Baker's factual recitation in *Boonville Convalescent Center, Inc. v. Cloverleaf Healthcare Services, Inc.* 790 N.E.2d 549, 550–56 (Ind.Ct.App.2003), *reh'g granted, trans. denied.*

pay monthly rent, real estate taxes, and insurance, to repair any damages, and to maintain the structural integrity of the premises for twenty years. The nursing home was in good condition in 1986.

On March 31, 1986, CHS assigned the lease to CHB, a newly organized corporation, which had the same officers, directors and shareholders as CHS. Thereafter, on August 1, 1991, CHB subleased the premises to Sherwood Healthcare Corp., which subsequently assigned its lease and sublease to BritWill Healthcare Company, which later changed its name to Raintree Healthcare Corporation (Raintree). Upon assignation of the lease to Raintree, Raintree's obligations pursuant to the lease were guaranteed by Whitehead, an experienced financier, owner, and operator of nursing homes.

Sometime in February of 2000, Boonville was notified by a representative from Raintree that they would be filing for bankruptcy on February 29, 2000. James Fields from Raintree informed Boonville that unless Boonville took control of the nursing home, Raintree would reject the lease and immediately notify the Indiana Department of Health to close the nursing home and relocate the patients. After receiving the notice, Ludwyck called upon CHS and its personal guarantors to honor their assumption obligations under the lease agreement and to commence operating the nursing home. Even though CHS could operate the nursing home, it refused to do so.

When the nursing home was abandoned in the Winter of 2000, CHS' assignee left the home in an extreme state of disrepair with 67 patients in residence. The nursing home had holes in the ceiling, flooring, and foundation. Water damage and mold permeated the building. Air conditioning units and showers leaked water into the crawl space. This situation was exacerbated by the neglected drainage system which directed surface and rain water into the same crawl space. Neglected roof leaks, downspouts, and patio drains resulted in rainwater seeping into the dining room, damaging its floor and joists, ceiling, and walls. In an effort to mitigate the damage, Ludwyck operated the facility as Southwind Healthcare, Inc. (Southwind) on a purely temporary basis while continuing to look for a permanent tenant or buyer. To that end, Southwind and Raintree executed an agreement regarding the transfer of the nursing home. Ludwyck had formed Southwind with his wife, and they were the sole shareholders of that corporation. He advised CHS, its co-signers and their legal counsel of his actions and intentions. Based on the condition of the nursing home, Ludwyck encountered difficulties in finding a new tenant. Therefore, in order to make the facility more attractive to potential lessees, Ludwyck invested substantial sums, as money was available, in repairing and restoring the building.

On August 22, 2000, Boonville filed its complaint against Cloverleaf, claiming that they were liable for payments under the lease because they had acted as guarantors under the 1986 lease agreement. On November 21, 2000, Cloverleaf filed a third-party complaint against Whitehead. On December 12, 2002, the trial court granted summary judgment in favor of Cloverleaf. On June 24, 2003, this court reversed the trial court's grant of summary judgment and remanded this cause to the trial court with instructions that it enter judgment for Boonville on the issue of liability under the lease and to hold a hearing for a determination of damages.

Over a seven-day period in November of 2004, the trial court conducted a bench trial hearing evidence on the issue of damages. Thereafter, on December 27, 2004, the trial court entered findings of fact and conclusions of law against Cloverleaf in the

amount of $1,797,192.65. This total damage award consists of $823,853.62 for maintenance and repair costs, $173,472.00 for taxes, $640,000.00 for attorney fees, and $159,867.03 for rent and interest.

Boonville filed its notice of appeal on January 4, 2005. On January 8, 2005, Dominion Realty, Inc. tendered the judgment amount on behalf of Cloverleaf to the Hendricks County Clerk. Boonville did not accept payment or release the judgment. On January 25, 2005, after Dominion Realty, Inc. had paid the judgment for Cloverleaf, Cloverleaf moved to dismiss the appeal, arguing that the judgment was not final and appealable. On February 18, 2005, the trial court amended its judgment pursuant to Trial Rule 54(B), and consequently we denied Cloverleaf's motion to dismiss on March 2, 2005.

Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### Standard of Review

■ In the instant case, the trial court entered special findings of fact and conclusions of law pursuant to Ind. Trial Rule 52(A). Therefore, our standard of review is two-tiered: we first determine whether the evidence supports the trial court's findings, and second, we determine whether the findings support the judgment. *Infinity Products, Inc. v. Quandt*, 810 N.E.2d 1028, 1031 (Ind.2004), *reh'g denied.* Findings of fact are clearly erroneous when the record lacks any reasonable inference from the evidence to support them, and the trial court's judgment is clearly erroneous if it is unsupported by the findings and the conclusions which rely upon those findings. *Id.* In determining whether the findings or the judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom. *Id.*

In conducting our review, we cannot reweigh the evidence or judge the credibility of any witness, and must affirm the trial court's decision if the record contains any supporting evidence or inferences. *Id.* However, while we defer substantially to findings of fact, we do not do so to conclusions of law. *Carmichael v. Siegel,* 754 N.E.2d 619, 625 (Ind.Ct.App.2001). We evaluate questions of law *de novo* and owe no deference to a trial court's determination of such questions. *Id.*

## APPEAL

### I. Rental Adjustments under the Lease Agreement

Boonville first contends that the trial court erred as a matter of law in construing the lease agreement. Specifically, Boonville argues that, despite the express language of the lease, the fourteen-year payment history by the tenants, and the trial court's own findings of fact, the trial court nevertheless concluded that the rent must be adjusted in accordance with paragraph 2(D) of the lease, instead of paragraph 3, rental payments.

As we have previously held, the construction of a written contract is a question of law. *Eskew v. Cornett,* 744 N.E.2d 954, 957 (Ind.Ct.App.2001), *trans. denied.* When interpreting a contract, our paramount goal is to ascertain and effectuate the intent of the parties. *Id.* This requires that the contract be read as a whole, and the language construed so as not to render any words, phrases, or terms ineffective or meaningless. *Id.* The unambiguous language of a contract is conclusive upon the parties to the contract and upon the courts. *Id.* When the language of a contract is clear and unambiguous, the intent of the parties is determined from the four corners of the instrument. *Id.* In such a situation, the terms are conclusive and we will not construe the

contract or look at extrinsic evidence, but will merely apply the contractual provisions. *Id.*

However, if the contract is ambiguous or uncertain in its terms, then extrinsic circumstances and rules of contract construction may be employed to help construe the contract and ascertain the intent of the parties. *Ruff v. Charter Behavioral Health System of Northwest Ind., Inc.*, 699 N.E.2d 1171, 1176 (Ind.Ct. App.1998), *trans. denied.* The test for determining the existence of an ambiguity is whether reasonably intelligent persons could come to different conclusions as to the contract's meaning. *Id.* Any ambiguities in a contract are to be strictly construed against the party who employed the language and who prepared the contract. *Id.*

## A. *Lease Agreement*

In the instant case, Boonville contends that the trial court erred in concluding that "rent is calculated pursuant to Section 2(D) of the lease." (Appellant's App. p. 80). Based on this conclusion, Boonville maintains that the trial court disregarded the unambiguous language of the lease and calculated the rent due based on a single sentence of paragraph 2(D), which was lifted out of context and resulted in rendering paragraph 3 effectively meaningless.

Paragraph 3 of the lease reads, in pertinent part, as follows:

3) *RENTAL.* Lessee covenants and agrees to pay to Lessor without demand, at the address of Lessor, or to such other person or corporation at such place as Lessor may by notice in writing to Lessee from time to time direct, at the following rates and times:

A) *Rental Payments.* Lessee shall pay Lessor an annual rental of Eight and 60/100 ($8.60) for each of the one hundred seven (107) beds per day in Twelve (12) equal monthly installments of Twenty Seven Thousand Nine Hundred Eighty Nine and 42/100 Dollars ($27,989.42). The second year (12 months) the rate will be Nine Dollars ($9.00) for each 107 beds per day in Twelve (12) equal monthly installments of Twenty Nine Thousand Two Hundred Ninety One and 25/100 Dollars ($29,291.25). The third year (12 months) the rate will be Nine and 40/100 Dollars ($9.40) for each 107 beds per day in twelve equal monthly installments of Thirty Thousand Five Hundred Ninety Three and 08/100 Dollars ($30,593.08). Said rental shall be paid whether or not the 107 beds are occupied. In the event the number of licensed beds shall be increased or decreased the rental shall be adjusted accordingly. No decrease in rent shall be allowed for a voluntary decrease in the number of beds by the lessee. If the facility's licensed number of beds is impaired, decreased, or removed due to the negligence of the lessee, the contract shall not be voided due to the lessee's failure to perform.

B) *Rental Adjustment:* After the third year of the effective date of this lease, such rental payment shall be adjusted annually on the anniversary date of this lease. The adjustment for subsequent 17 years shall be as follows: Take the average increase in the routine patient day revenue amount of the prior two years to compute the fourth and subsequent annual rental rate, for example: Assume the following average daily routine patient revenues had been in effect prior to 1988 including the initial partial year, April 1, 1986 to December 31, 1986.

4/86–12/86 - $45.00 1/87–12/87 - $47.50

These two rates would result in an increase for April 1, 1989 of 5.55% to the 1988 annual rental rate. Thereafter

rates will be computed on a full calendar year basis. If the average daily routine patient revenue of the prior two years are the same or there was a decrease between the two years, the daily rental rate for the rental payment for the next year would stay the same. Routine patient revenues and the corresponding census will be computed consistently including half days, hospital leave days, and etc.

The Lessor at the time of the anniversary period shall be permitted access and provided a copy of the financial statements, records and rate setting work papers to verify the next annual rental rate.

(Appellant's App. pp. 388–89).

In its conclusions of law, the trial court disregarded this paragraph of the lease agreement and, instead, seized on a single sentence in paragraph 2(D) to calculate the rental adjustments. Paragraph 2 of the lease reads as follows:

2) *TERM.* The term of this Lease shall be for a period of twenty (20) years commencing on the acceptance or occupancy of said nursing home by Lessee. A formally certified acceptance shall be executed by Lessee on the attached Addendum. *This lease is conditioned upon and shall not become a binding obligation until:*

A) Lessee has received final approval for the Lease, at the terms set forth in this document from the Indiana State Board of Health acting in its capacity as the Designated Planning Agency under Indiana's Determination of Need law and Section 1122 of the Social security Act.

B) Lessee has satisfactory assurance of receipt of a full comprehensive care license as a 107–bed health care facility.

C) Lessee has satisfactory assurance of the granting of certification as a 91–bed intermediate care Medicaid provider by the Indiana Department of Public Welfare.

D) Lessee has satisfactory assurance that it will be granted recognition as a new provider for rate setting under Indiana Medicaid Nursing Home Rate Setting Criteria and that *the costs of this lease will be allowable in the setting of the lessees' base Intermediate care rate.*

(Appellant's App. pp 387–88); emphasis added.

Even though the trial court initially found that Cloverleaf and its assignees paid monthly rent for fourteen years in accordance with the formula set forth in paragraph 3; nevertheless, the trial count concluded that rent has to be calculated pursuant to paragraph 2(D). To support its conclusion, the trial court focused on the language in paragraph 2(D)—that the costs of this lease will be allowable in the setting of the Lessee's base Intermediate care rate—to find that the lease rental computations under this section resulted in a rental amount reasonably close to the rental cost computation under paragraph 3 of the lease. This finding, combined with Cloverleaf's expert testimony, prompted the trial court to calculate the rental obligation pursuant to the base intermediate care rate.

However, given the plain and unambiguous language of the lease, we conclude that the rental payments are governed by paragraph 3 of the lease agreement, not paragraph 2(D). A close reading of the lease reveals that paragraph 2(D) governs the term of the agreement, with its sections A through D stipulating the conditions precedent to the commencement of that term. In this light, section D elaborates that Cloverleaf first had to be recognized as a new provider under Indiana's Medicaid program, with approval of the costs of the lease as it relates to Cloverleaf's base intermediate care rate. In the event that

the conditions would not have been fulfilled, the lease term would not have become a binding obligation. Nowhere in paragraph 2, do we discern any guidance as to the computation of the party's rental obligation.

On the other hand, our reading of paragraph 3 of the lease provides us with a complete and thorough guideline as to how to calculate the monthly rent and its yearly adjustments. Not only does paragraph 3 specify the monthly base amount of the rent, but also explains the method for calculating rental increases and sets forth an example of the calculation of the yearly rental adjustments.

In its conclusion, the trial court removed a short phrase from the end of the final section of paragraph 2 and gave it an independent life. Reviewing the trial court's conclusion in combination with paragraph 2(D), we fail to understand how a lessee, based on this sentence alone, can calculate the rent due under the lease. Paragraph 2(D) lacks even the beginning of an explanation as to the computation of rental increases, and, more importantly, fails to assign a starting point of these computations. Thus, affirming the trial court's conclusion would effectively result in erasing paragraph 3 from the lease because it would be redundant and meaningless. This we will not do.

Keeping in mind that we have to construe a written contract as a whole and consider all of the provisions of the contract and not just the individual words, phrases, or paragraphs, we conclude that the parties' rental obligations are governed by paragraph 3 of the lease. *See Eskew,* 744 N.E.2d at 957. Based on the four corners of the document, paragraph 3 of the lease unambiguously sets forth the monthly rent, its adjustments, and method of calculation. Accordingly, since the language of the contract is unambiguous we only apply the terms of the contract and do not have to review extrinsic evidence. *See id.* Consequently, we find that the trial court erred as a matter of law in concluding that paragraph 2(D) of the lease governs the rent due under the contract. Therefore, we reverse the trial court's conclusion and remand with instructions to calculate the rent in accordance with paragraph 3 of the lease.

### B. *Rental Calculations*

■ Next, Boonville contends that the trial court incorrectly calculated the interest and late charges due under the lease. In support of its argument, Boonville focuses this court's attention on paragraph 3(C) of the lease, which reads as follows:

> The first rental payment shall be due in advance and payable on March 31, 1986, and thereafter, rent shall be paid on the first day of each month following April, 1986 and prorated for the last month of the Lease. A Five Percent (5%) late charge shall be added to any rental five (5) days past due. An additional penalty of Fifteen Percent (15%) interest per annum per day shall be charged on all unpaid rental balances more than thirty (30) days past due.

(Appellant's App. p. 389). Citing to this court's opinion in *Gershin v. Demming,* 685 N.E.2d 1125 (Ind.Ct.App.1997), Boonville correctly argues that Indiana courts enforce late fees when they do not rise to the level of a penalty. However, we agree with Cloverleaf that Boonville's citation to *Gershin* has no effect on the interpretation of the lease. Rather, the issue before us is whether the trial court erred as a matter of law in determining the penalty under paragraph 3(C) of the lease, not whether the late charge or interest payment was excessive. In this light, the trial court concluded, in pertinent part, that: "Additionally, while rent is subject to a five percent (5%) late penalty payment, the fifteen percent (15%) interest calculation is

*not* calculated on both rent and the five percent (5%) late fee." (Appellant's App. p. 80).

As we review a trial court's interpretation of the lease *de novo*, we conclude that the trial court erred in its calculation of the late fee. *See Western Southern Life Ins. Co. v. Acton,* 779 N.E.2d 941, 943 (Ind.Ct.App.2002), *trans. denied* (review of interpretation of unambiguous contract is *de novo*). The clear language of paragraph 3(C) indicates that an initial five percent late charge is *added* to the rental amount five days past due. Accordingly, since the late charge is added to the rent, it actually becomes part of the rent after it is assessed. Thereafter, the section specifies that an additional penalty of fifteen percent shall be charged on all unpaid *rental balances.* Consequently, because the initial five percent late charge is included within the rent, we find that the additional penalty of fifteen percent is assessed on top of the five percent. Thus, we reverse the trial court's conclusion, and remand with instruction to calculate the interest and late charges in accordance with this opinion.

## II. *Mitigation*

Boonville now argues that the trial court erred by crediting Cloverleaf with rental charges never paid while at the same time failing to assess Cloverleaf with the cost of utility and insurance expenses. Specifically, Boonville asserts that it was legally entitled to be reimbursed for the costs incurred and should not have been penalized for Southwind's payment of rent because the operational losses exceeded any rent paid or accrued. As a result, Boonville maintains, the trial court's action in deducting the rent charged to Southwind from Cloverleaf's obligation, even though Southwind never paid, while not reimbursing Boonville for the utility and insurance expenses doubly penalizes Boonville. On the other hand, referencing the doctrine of mitigation of damages, Cloverleaf contends that it is entitled to mitigation of its rent equal to Southwind's monthly rental amount.

Initially, we note that this court in *Boonville I* already determined that Boonville mitigated its damages. We stated that "[m]oreover, it was Boonville and Ludwyck who made the necessary repairs simply to preserve the building's viability as a nursing home and to mitigate damages following Boonville's repeated oral and written demands that [Cloverleaf] honor [its] obligations under the lease." *Boonville I,* 790 N.E.2d at 556. Under the law of the case doctrine, an appellate court's determination of a legal issue is binding both on the trial court on remand and on the appellate court on a subsequent appeal, given the same case with substantially the same facts. *Montgomery v. Trisler,* 771 N.E.2d 1234, 1238 (Ind.Ct. App.2002), *trans. denied* (citing *Humphreys v. Day,* 735 N.E.2d 837, 841 (Ind. Ct.App.2000), *trans. denied* ). All issues decided directly or implicitly in a prior decision are binding on all subsequent portions of the case. *Montgomery,* 771 N.E.2d at 1238. Even though the law of the case doctrine is discretionary, we fail to find any extraordinary circumstance which could persuade us to revisit the issue already decided. *See State v. Huffman,* 643 N.E.2d 899, 901 (Ind.1994), *reh'g denied.*

Accordingly, since we found that Boonville mitigated its damages by leasing the nursing home to Southwind upon Cloverleaf's default, Cloverleaf is entitled to a set off in the amount of the rents collected from Southwind. *See Merkor Management v. McCuan,* 728 N.E.2d 209, 212 (Ind.Ct.App.2000) (where we held that if a landlord is successful in reletting the premises, the tenant is entitled to a set off in the amount of the rents collected from

the subsequent tenant). However, Boonville appears to argue that Southwind never actually paid rent because "Ludwyck owned both Boonville and Southwind, Ludwyck described the arrangement as 'taking money out of one pocket and putting it in the other pocket in the same pair of pants.'" (Appellant's Br. p. 24). We find this argument to be unavailing. The temporary lease entered into between Boonville and Southwind stipulated a base rent of $21,000 per month, less payments made by Southwind for repairs, utilities, maintenance, taxes, and insurance. The fact that Southwind and Boonville were owned by the same individual is irrelevant for the application of the doctrine of mitigation. If we were to accept Boonville's argument, no landlord would ever attempt to mitigate damages by reletting the property. Instead, immediately upon default, the landlord would retake possession of the premises, operate them for his own profit and seek the full rental amount of the defaulting tenant.

■■ Likewise, we conclude that the trial court properly omitted utility and insurance expenses. Unlike maintenance costs, repair costs, and taxes, these expenses were incurred as a result of Southwind operating the nursing home. In the instant case, Boonville made a conscious decision to mitigate its damages by keeping the nursing home open through Southwind, and as such, the utilities and insurance are incidental expenses to its business operation. We cannot expect Cloverleaf to reimburse these costs. Consequently, we affirm the trial court's conclusion, crediting Cloverleaf with Southwind's rental payments while at the same time not assessing the utility and insurance costs.

### III. Termination of Lease

■■ Next, Boonville contends that the trial court erred in concluding that the lease ceased on October 31, 2004. Specifically, Boonville claims the trial court's finding does not support its choice of termination date.

In its judgment, the trial court found that

> Recovery of "post-trial damage" is contrary to Indiana law because they are (i) speculative, (ii) cannot be proved with reasonable certainty as required by Indiana law, (iii) disregard [Boonville's] duty to mitigate damages, and (iv) are not now recoverable as there is no acceleration clause in the lease. *Roberts v. Watson,* [172 Ind.App. 108] 359 N.E.2d 615, 621 (Ind.Ct.App.1977), *reh'g denied.*

(Appellant's App. p. 80). Based on this finding, the trial court concluded that "[r]ental obligations cease on October 31, 2004 (the day prior to trial)." (Appellant's App. p. 80).

Our review of the lease between Boonville and Cloverleaf reveals that the lease was executed on February 28, 1986 with a term of twenty years. Subsequently, Cloverleaf breached the lease in March of 2000, with another six years remaining under its term. In their briefs, the parties have not pointed to an acceleration clause within the executed document, and we have found none.

We have previously held that in an action for rent, absent an acceleration clause, the landlord can only recover the amount of rent due and unpaid. *Roberts v. Watson,* 172 Ind.App. 108, 359 N.E.2d 615, 621 (1977), *reh'g denied.* Therefore, the landlord's right of action on the lease for the whole amount of rent reserved matures only at the end of the term when all the installments have matured. *Id.* However, the landlord may bring actions for rent as it becomes due. *Id.* We acknowledge that at trial, Boonville did not request an award of rent not yet accrued but merely asked the trial court to set a hearing to

determine any additional rent after the expiration of the lease.

Based on our review, we agree with the trial court insofar as the trial court implies that Boonville cannot recover for rental obligations not yet due at the date of trial. Nevertheless, we reverse the trial court's conclusion terminating rental obligations between Boonville and Cloverleaf on October 31, 2004. We find no evidence in the record, and Cloverleaf does not proffer any, supporting the trial court's imposed termination date.

■ Instead, Cloverleaf now appears to argue that because Boonville, through Southwind, operated the nursing home its obligations under the lease ceased. We find Cloverleaf's argument meritless. The fact that Boonville, through Southwind, continued to operate the nursing home is only relevant for purposes of mitigation; this effort by the landlord does not release a breaching tenant from his obligation to pay rent. Consequently, because we conclude that Cloverleaf's rental obligations under the lease expire in accordance with the term of the lease, *i.e.*, February of 2006, Boonville is entitled to request a hearing at the expiration of the lease to determine the amount of additional rent due, less mitigation.

## IV. *Attorney Fees*

Lastly, Boonville asserts that based on the presented evidence with regard to the complexity of the case and logged attorney hours, the trial court abused its discretion in awarding a mere $640,000 in attorney fees. In particular, Boonville argues that the trial court provided no factual basis for its conclusion that $640,000 was a reasonable attorney fee in this case.

In the instant case, although Boonville initially engaged counsel on an hourly basis, it soon became obvious that the complexity of the case imposed a financial burden on Boonville and, to continue pursuing its claim, required a contingent fee agreement. Thus, our review shows that Boonville first executed an agreement to pay counsel's out-of-pocket expenses and twenty percent of any amount recovered. Subsequently, Boonville agreed to pay counsel his expenses, twenty percent of any amount recovered up to five million dollars, and fifty percent of any amounts recovered thereafter.

■ A true "contingent fee" has two components: (1) payment is contingent on the outcome, and (2) the fee is a percentage deducted from the client's recovery. *Valparaiso Technical Institute, Inc. v. Porter County Treasurer*, 676 N.E.2d 416, 420 (Ind.Ct.App.1997), *reh'g denied.* Here, while payment of the attorney's fee was contingent upon Boonville prevailing, the fee was added to the judgment rather than deducted from recovery. Thus, the use of the term "contingent fee" is only partially correct. In *Valparaiso Technical Institute, Inc.*, we held that where such a fee is subtracted from the amount recovered, the third-party debtor is unaffected by the fee agreement. *Id.* However, it is an entirely different matter when the fee is added to the judgment against the debtor. *Id.* In that instance, the debtor has a direct pecuniary interest in how the fee is determined. *Id.* Therefore, a contingent fee that is reasonable when deducted from a client's recovery may be unreasonable when added to a debtor's judgment. *See id.* For that reason, we held that without other objective evidence of reasonableness, a contingent fee cannot be added to a judgment against a third party. *Id.*

■ In considering the reasonableness of an attorney's fee, it makes no difference whether the obligation to pay the fee is based on a statutory provision or on a prior agreement. *Id.* at 421. Instead, the determination of reasonableness of an attorney's fee requires consideration of all

relevant circumstances; our Indiana Professional Conduct Rule has provided a useful, non-exclusive, list of factors for a trial court to consider when evaluating the reasonableness. *See Mason v. Mason,* 561 N.E.2d 809, 811 (Ind.Ct.App.1990); *Venture Enterprises, Inc. v. Ardsley Distributors, Inc.,* 669 N.E.2d 1029, 1034 (Ind.Ct. App.1996), *reh'g denied.*

The trial court, in the case before us, concluded that "a reasonable attorney fee in this case is $640,000," based on the following finding:

> Section 4 of the Lease states that "Lessee hereby agrees that it will pay Lessor's attorney fees for the collection of said delinquent rental and for any other litigation that may arise in connection with this Lease or the occupancy of said premises by Lessee."

(Appellant's App. pp 71, 72). Besides stating the applicable legal rules, the trial court did not enter any specific findings as to its computations or basis for reasonableness of the awarded fee.

In reviewing the record, we noticed an amount of evidence apparently disregarded by the trial court in its findings. The record reflects that Boonville's counsel logged 3,351.3 hours in preparing this case. Its complexity is evidenced by Cloverleaf's assertion of 18 affirmative defenses, the filing of several motions for summary judgment, the appeal of the trial court's ruling on summary judgment to this court, filing a petition for rehearing and transfer to the supreme court. Based on the totality of the evidence available, Boonville's expert witness concluded that a reasonable attorney fee in this case would be around $1,126,088.

While the trial court's conclusion is clearly stated, it cannot in itself support

the contingent fee award in this case where the fee was added to the judgment against the third party. *See Valparaiso Technical Institute, Inc.,* 676 N.E.2d at 420. Nevertheless, the trial court's judgment is silent as to what factors it considered in calculating the attorney's fee and, as a whole, fails to enter any findings that support its determination of reasonableness. Accordingly, since the trial court did not enter any findings supporting its conclusion, we find that the judgment is clearly erroneous. *See Infinity Products, Inc.,* 810 N.E.2d at 1031. Consequently, we reverse and remand to the trial court with instructions to determine a reasonable attorney fee.[4]

### CROSS–APPEAL

#### Maintenance Costs

On cross-appeal, Cloverleaf contends that the trial court erred in concluding that Cloverleaf is responsible for maintenance costs in the amount of $823,853.62. Specifically, Cloverleaf asserts that Ludwyck, Boonville's owner, testified that he was not seeking reimbursement for incurred maintenance costs. As a result, Cloverleaf maintains that the record does not contain evidence supporting the trial court's finding.

In *Boonville I,* we stated that

> [I]t was Boonville and Ludwyck who made the necessary repairs simply to preserve the building's viability as a nursing home and to mitigate damages following Boonville's repeated oral and written demands that [Cloverleaf] honor their obligations under the lease. In the event that Boonville had released [Cloverleaf], it would have been left to oper-

---

**4.** We refrain from deciding whether the awarded attorney fee is reasonable. We remand because the trial court failed to enter any findings supporting objective evidence of reasonableness. *See Valparaiso Technical Institute, Inc.,* 676 N.E.2d at 420.

ate a nursing home in extreme disrepair that was nearly forty percent vacant. *Boonville I*, 790 N.E.2d at 556. As we held in *Boonville I* that Boonville's actions did not release Cloverleaf from its obligations under the lease agreement, we note that paragraph 14 of the lease agreement specifies, in pertinent part, that:

[Cloverleaf] will, at its own expense during the term of this Lease, keep and maintain the structural integrity of the building structure erected on the demised premises.... [Cloverleaf] will, at its own expense, during the term of this Lease, keep all other parts or portions of the building and demised premises in good order and repair, including but not limited to the plate glass, plumbing, heating and air-conditioning facilities within the Lease premises. The demised premises shall be returned to [Boonville] at the termination of the Lease in as good condition, as originally leased, reasonable wear and tear and damage by fire or other casualty or elements excepted.

(Appellant's App. p. 393). At the time of Cloverleaf's default under the lease, the nursing home was in such disrepair that we specifically mentioned in *Boonville I*'s factual recitation that "Boonville maintained that the areas of disrepair included the air conditioning and electrical systems, certain concrete areas, drainage units, carpeting, wall coverings, parking lots, furniture and other equipment." *Boonville I*, 790 N.E.2d at 553.

Even though the record clearly reflects that during his testimony, Ludwyck rejected reimbursement for maintenance and repair costs, the trial court, nevertheless, over Cloverleaf's objection, admitted into evidence exhibit 141, containing 544 pages of various bills, invoices, and statements which Boonville claimed represented its repair and maintenance costs. The total amount represented by exhibit 141

amounts to $823,853.62. Boonville, in its brief, now explains its rejection of maintenance costs on the ground that the trial court should either: 1) have credited Cloverleaf for Southwind's rent and awarded Boonville the repair/maintenance costs, utilities, insurance, and taxes; or 2) netted out the two lease paragraphs and neither credited Cloverleaf for Southwind's rent nor charged Cloverleaf for repair and maintenance costs.

■ Based on the evidence before us, we find that the trial court's conclusion is not clearly erroneous. *See Infinity Products, Inc.*, 810 N.E.2d at 1031. As we stated before, although Boonville's maintenance costs, repair costs, and taxes are excluded from mitigation, they were nevertheless incurred during Cloverleaf's operation of the nursing home and are a direct result of its neglect of the facility. According to the lease agreement, the maintenance and repair costs are Cloverleaf's responsibility and we conclude that they did not cease because of Cloverleaf's default under the lease. Our review of the record shows that during trial, Boonville introduced evidence establishing the maintenance costs, repair costs, and taxes. However, it is also clear from the record that neither Cloverleaf nor Whitehead cross-examined Ludwyck to distinguish between maintenance and repair costs versus renovation costs after Ludwyck's admission that he solely asked reimbursement for lease payments. Consequently, although we find that the trial court properly awarded maintenance costs, repair costs, and taxes to Boonville, we remand for substantiation of the different amounts in exhibit 141 and a determination of the maintenance and repair costs. *See id.*

### THIRD PARTY APPEAL

#### I. *Request for Jury Trial*

■ In his third-party appeal, Whitehead first contends that the trial court

erred in holding in its Order of May 29, 2002, that Whitehead would be bound by the result of the bench trial between Boonville and Cloverleaf, *i.e.*, the trial court's Order of December 27, 2004, even though Whitehead had made a timely jury demand, and the trial court had recognized Whitehead's right to a jury trial in the third party action between Cloverleaf and Whitehead.

Our review of the record reveals that on May 14, 2002, Whitehead filed its Motion to Bifurcate, or Alternatively for Separate Trials. In his motion, Whitehead made the following assertions:

2. Whitehead demands a jury, while no jury demand was filed in the main action. Whitehead requests bifurcation and/or a separate trial of the third-party action against him. The transaction which gave rise to the original lease in 1986, and the 1991 and 1992 transactions on which the third-party action against Whitehead are based, are totally separate transactions, which will involve essentially separate proof at trial, including separate witnesses and separate exhibits. To try the main action and the third-party action at the same time will no doubt result in great jury confusion and will substantially prolong both proceedings because three separate lawyers will be involved who will be participating in the questioning of witnesses and objecting to the questions and testimony with respect to all of the evidence presented, when only the 1991 and 1992 transactions are directly pertinent to Whitehead.

(Appellant's Supplemental App. p. 451). Thereafter, on May 29, 2002, the trial court entered its Order, stating that:

The trial of the Third–Party Complaint shall be bifurcated from the trial of the primary case. The primary case shall be a bench trial, and the trial of the Third–Party Complaint shall be a jury trial. However, [Whitehead] shall be bound by determinations of law or facts made during the trial of the primary case. [Whitehead] had not requested a jury trial of the primary case.

(Whitehead App. p. 4). The record lacks any evidence indicating that, during the twenty-nine months between the trial court's bifurcation Order and the commencement of the primary case between Boonville and Cloverleaf, Whitehead requested a jury trial in the primary case. Rather, the record reflects that Whitehead's counsel not only participated in the trial, but he also successfully argued that he had the right to participate and to cross-examine witnesses because Whitehead would be bound by the outcome.

Nevertheless, on January 26, 2005, approximately a month after the trial court's entry of its findings of fact and conclusions of law in the primary case between Boonville and Cloverleaf, Whitehead filed his Motion to Certify Orders for Interlocutory Appeal requesting the trial court to certify its May 29, 2002 bifurcation Order for interlocutory appeal. On April 7, 2003, the trial court denied Whitehead's motion because it was time-barred and the trial court did not find any grounds to accept a belated filing. Together with his motion to certify, Whitehead also filed a Motion to Correct Error, raising his objection to the May 29, 2002 bifurcation Order, which was also denied by the trial court.

Despite the clear language in the trial court's bifurcation Order, Whitehead now asserts that he should be entitled to relitigate every issue already litigated and decided in the primary case between Boonville and Cloverleaf in hopes of arriving at an outcome different during a jury trial than the one reached by the trial court. We are not persuaded. Whitehead's claim, in effect, amounts to an appeal of the bifurcation Order which was entered on

May 29, 2002 and which decided that Whitehead would be bound by the determination of the law or facts made during the trial of the primary case. An appeal of a discretionary interlocutory order is governed by Indiana Appellate Procedure Rule 14(B), which holds that a motion requesting certification of an interlocutory order must be filed within thirty days of the trial court's entry of the order. Accordingly, Whitehead's motion to certify the trial court's interlocutory bifurcation Order filed approximately one year after the entry of the order was time barred.

Furthermore, Whitehead completely failed to follow the required procedure for appeal of a discretionary interlocutory order. Ind.Appellate Rule 14(B) states that an appeal may be taken from discretionary interlocutory orders if the trial court certifies its order and we accept jurisdiction over the appeal. Here, not only did the trial court deny Whitehead's motion for certification, as a result, we never accepted jurisdiction of this appeal. Consequently, Whitehead's appeal with regard to the trial court's bifurcation Order is not properly before this court. Thus, we hold that the trial court's findings of fact and conclusions of law as entered in its Order of December 27, 2004 is binding on Whitehead.

## II. *Binding Effect of Boonville I*

Next, in his continuing effort to relitigate issues already decided in *Boonville I,* Whitehead contends that Boonville failed to mitigate its damages because it made no effort to relet the nursing home during the year 2000 or early 2001. However, both Boonville and Cloverleaf assert that the issue of whether Boonville mitigated its damages was conclusively decided in our opinion of *Boonville I,* which has become the law of the case and is therefore binding on Whitehead.

The record discloses that Boonville instituted this action on August 22, 2000. Clo-verleaf filed its third-party complaint against Whitehead on November 21, 2000, with Whitehead's counsel filing an appearance on April 10, 2001. Thereafter, Boonville, Cloverleaf, and Whitehead argued on summary judgment, leading to the trial court's grant of summary judgment for Cloverleaf on December 12, 2002. Boonville appealed this Order, and we reversed the trial court's order in *Boonville I,* entered judgment in favor of Boonville, and remanded for a damages hearing.

■■■ As we stated before, in *Boonville I* we determined that "it was Boonville and Ludwyck who made the necessary repairs simply to preserve the building's viability as a nursing home and to mitigate damages following Boonville's repeated oral and written demands that [Cloverleaf] honor [its] obligations under the lease." *Boonville I,* 790 N.E.2d at 556. Under the law of the case doctrine, an appellate court's determination of a legal issue is binding both on the trial court on remand and on the appellate court on a subsequent appeal, given the same case with substantially the same facts. *Montgomery,* 771 N.E.2d at 1238. All issues decided directly or implicitly in a prior decision are binding on all subsequent portions of the case. *Id.* This doctrine merely expresses the practice of the courts generally to refuse to reopen what has been decided and is based upon the sound policy that when an issue is litigated and decided, that should be the end of the matter. *Id.*

Whitehead now asserts that he was prevented from participating in the previous appeal, and therefore, *Boonville I* is not binding on him. However, the record proves otherwise. We first note that in accordance with Indiana Appellate Rule 17(A), a "party of record in the trial court or Administrative Agency shall be a party on appeal." Here, Whitehead was a party of record in the trial court, and therefore,

as a result Whitehead was a party on appeal. The record further shows that on January 16, 2003, Whitehead filed a motion requesting the trial court to reconsider its Order staying the third-party claim pending Boonville's appeal of the subsequently overturned summary judgment. On January 24, 2003, the trial court denied this motion to reconsider and, thereafter, Whitehead filed a notice of appeal of the trial court's Order on February 21, 2003. Cloverleaf moved to dismiss Whitehead's appeal of the denial of his motion to reconsider because the Order was not ripe for review. In this court's Order of April 9, 2003, we agreed and stated that

> [Cloverleaf] asks the [c]ourt to dismiss the appeal, contending there is no final judgment because its third-party complaint and Whitehead's third-party counterclaim are still pending. [Cloverleaf] also asserts that the trial court has not certified the January 24, 2003, order as final under Trial Rule 54(B) or as an interlocutory order properly certified for appellate review under Appellate Rule 14(B).
>
> In his response, Whitehead appears to contend that the practical import of the summary judgment ruling was to enter final judgment because the ruling allegedly makes [Cloverleaf's] third-party complaint moot. Whitehead, however, does not explain how he can raise this issue in this appeal considering that his Notice of Appeal was filed to challenge the denial of his Motion to Reconsider the imposition of the stay.

(Whitehead's Addendum p. 3). Accordingly, we dismissed Whitehead's appeal without prejudice.

▪ Based on our Order of April 9, 2003, it is clear that we merely dismissed Whitehead's attempt to appeal the denial of his motion to reconsider. This Order did not prevent Whitehead to join in the appeal against the summary judgment.

However, since Whitehead chose not to join in the appeal, he cannot now complain that *Boonville I* is not binding on him. Because Whitehead was a party on appeal, the law of the case doctrine ensures that all issues decided directly or implicitly in *Boonville I* are binding on him. *See id.* Accordingly, we find that Whitehead can no longer contest the issue of mitigation.

*CONCLUSION*

Based on the foregoing, we conclude that the rental adjustments under the twenty-year lease between Boonville and Cloverleaf are governed by paragraph 3, not paragraph 2(D), of the lease agreement and, with regard to the late charges, we conclude that the additional penalty of fifteen percent must be assessed on top of the five percent late charge. We affirm the trial court's conclusion that Cloverleaf should be credited with Southwind's rental payments while at the same time not assessing utility and insurance costs. We further hold that Boonville is entitled to request a hearing at the expiration of the lease in February of 2006 to determine the amount of additional rent due, less mitigation. We also remand to the trial court to find objective evidence of reasonableness in its determination of a proper attorney fee to be awarded to Boonville.

With regard to Cloverleaf's cross-appeal, we remand to the trial court for substantiation of the maintenance costs and repair costs.

We conclude that Whitehead's appeal with regard to the trial court's bifurcation Order is not properly before this court, and as a result, we hold that Whitehead is bound by the trial court's findings of fact and conclusions of law entered in its Order of December 27, 2004. Accordingly, because Whitehead was a party of record at trial but chose not to appeal the trial court's grant of summary judgment, our

subsequent reversal of the trial court's Order in Boonville I is binding on Whitehead.

Affirmed in part, reversed in part, and remanded with instructions.

BAKER, J., and MATHIAS, J., concur.