## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 28 2015, 10:02 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Julie Dixon
Lori B. Schmeltzer
Ciyou & Dixon, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Karen Celestino-Horseman
Austin & Jones, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Nina Ozuyener,

*Appellant-Petitioner,*

v.

Korkut Ozuyener,

*Appellee-Respondent.*

January 28, 2015

Court of Appeals Cause No.
49A02-1404-DR-238

Appeal from the Marion Superior Court
The Hon. Patrick L. McCarty, Judge
Cause No. 49D03-1303-DR-9657

**Bradford, Judge.**

# Case Summary[1]

[1] On March 11, 2013, Appellant-Petitioner Nina Sidibe Ozuyener ("Wife") filed a Petition for Dissolution of Marriage from her husband Appellee-Respondent Korkut Ozuyener ("Husband"). On September 13, 2010, Husband and Wife (collectively "the parties") executed an estate planning package which included, among other things, a document entitled "Post-Nuptial Agreement" ("the Agreement") which determined the distribution of marital assets in the event of death or divorce. Wife requested that the trial court enforce the Agreement. The trial court found that the Agreement was unenforceable due to a lack of full disclosure to Husband regarding the nature of the Agreement. On appeal, the parties dispute which Indiana statute governs the Agreement, whether the Agreement was supported by consideration, and whether the trial court abused its discretion in finding that the Agreement was unenforceable. Finding that the trial court did not abuse its discretion by rejecting the Agreement, we decline to address the additional issues. Affirmed.

# Facts and Procedural History

---

[1] We heard Oral Argument in this case on January 8, 2014 and we thank counsel for the quality of their presentations.

[2] On March 11, 1999, Husband and Wife married. The couple had two children together. In July of 2010, the parties had an initial consultation with attorneys Hannah Joseph and Carly Turow (collectively the "Attorneys") of the law firm of Joseph and Turow. Husband and Attorneys testified that the original purpose of the meeting was to discuss an estate planning package. Wife testified that the original purpose of the meeting was to discuss a prenuptial (later termed a postnuptial) agreement and only then did the Attorneys recommend a broader suite of estate planning documents. Turow and Wife testified that Husband initiated the conversation about a postnuptial agreement at the initial meeting and that he wanted a postnuptial agreement to prove to Wife that he did not marry her for her family's money. The Attorneys agreed to represent both Husband and Wife in drafting the Agreement. On June 30, 2010, Joseph sent an engagement letter addressed to both Husband and Wife confirming Attorneys' representation of the parties. The engagement letter was signed only by Wife as "Client." Respondent's Ex. A. It is unclear whether the parties were orally advised of the potential for a conflict of interest and of the benefits of obtaining separate counsel. There was no such written advisement. Attorneys also represented Wife and her family in unrelated matters during the same period of time.

[3] On September 13, 2010, the parties executed an estate planning package consisting of a durable power of attorney, designation of health care representative, last will and testament, funeral planning, and a document entitled "Post-Nuptial Agreement." The Agreement sets forth, among other

things, how the parties' assets would be divided in the event of divorce and allocates significantly more of the marital assets to Wife. This disproportionate allocation was intended to reflect the amount of assets contributed to the marriage by the parties. Specifically, Wife's family had contributed a $300,000 down payment on the couple's family home ("the Diver's Cove property"), and had purchased a Chicago property of which a fifty-percent interest was gifted to Wife.

[4] The Agreement states that, in the event of divorce, the parties' property was to be divided according to financial-declaration statements attached to the Agreement. Attorneys gave the parties template financial-declaration forms which Wife filled out for both parties and returned to Attorneys. The forms were unsigned. It is unclear whether the financial statements were attached to the executed agreement. The copy of the Agreement in the Attorneys' file did not contain the financial-declaration forms. According to the financial-declaration statements, the Agreement purported to give Wife exclusive ownership rights to the Diver's Cove and Chicago properties, valued, in total, at $875,000 ($359,500 was still owed on those properties at the time the financial-declaration forms were completed). The Agreement gives Husband exclusive rights to an Indianapolis property valued at $55,000. The Agreement also gives Wife sole ownership of two savings accounts worth $340,000 and gives Husband sole ownership of two savings accounts worth $8,500. Attorney Turow stated that the Agreement was not so much a division of property as a "clear allocation to the [Wife's] side of the family." Tr. p. 29.

[5]     The details of the Agreement were developed throughout several emails between the Attorneys and the parties. Wife handled nearly all of the communications with Attorneys. Although Husband was copied on the majority of the email communications, he was left out of several emails specifically pertaining to the Agreement, namely its distribution of marital property. Although his signature and initials are on the Agreement, Husband maintains that he was unaware that a postnuptial agreement had been prepared for execution along with the other estate planning documents, that he did not read or know that he was signing a postnuptial agreement, and that he was not informed or aware of the financial-declaration statements. English is Husband's second language and he testified that he did not feel comfortable with his language skills when it came to reading technical documents. As such, throughout the course of the marriage, Husband relied heavily on Wife in conducting their family business affairs. Wife admitted to preparing Husband's financial-declaration statement but stated that she sent it to Husband for review. Husband claims he was not aware he had signed a postnuptial agreement until Wife informed him of such after she filed for dissolution.

[6]     On March 11, 2013, Wife filed a Petition for Dissolution of Marriage and requested that the trial court enforce the Agreement. After a two-day hearing concerning the validity of the Agreement, the trial court found that the Agreement was invalid and unenforceable and issued the following findings:

> 4.      [Husband] does not deny that [h]is initials and signature appear[] on the post nuptial agreement but [claims] that he was unaware that it was in a stack with the other documents at the time,

that he did not read it, was not informed of it and did not see any exhibits or attachments in the way of financial statements which described and identified the property that each party would retain as solely theirs.

5.     [Husband] contends that he would not have signed the agreement had he known of its existence, that he did not participate in the preparation of any financial statements and the existence of same was not disclosed to him.  Furthermore, that he was unaware of the agreement up to a point [in] time where [Wife] informed him of this shortly [] before proceeding with a dissolution of marriage action.

6.     [Husband] further testified that being unaware of the nature and meaning of a postnuptial agreement he resorted to internet research to determine such after being informed of the agreement's existence by [Wife].

7.     Evidence in the way of testimony from [Attorneys] had indicated that a discussion was had regarding a post nuptial agreement which included [Husband] but neither recalled any specific details about the discussions, questions asked if any by [Husband] with only one of the attorneys being present at the execution of the documents.

8.     Furthermore, there was no recall by the attorneys as to whether financial statements identifying what would be the sole or separate property of each party had been attached to the post nuptial agreement at the time of signing.

9.     The post nuptial agreement stipulated into evidence (previously filed with the court by the [Wife]) contained what appeared to be financial statements but unsigned by either party with a copy of the same agreement entered into evidence from the preparing attorneys file which was without said financial statements.

10.     Also introduced into evidence were numerous emails on the subject which [Husband] maintains he did not receive[] with some of the emails not copied to him as [Wife] testified that some things

deemed not important enough to copy him on regarding the postnuptial.

11.     [Husband] was further found to trust and rely greatly on [Wife] in conducting their business affairs.  While it is undisputed that [Husband]'s initials and signature appear[] on the post nuptial agreement it is not clear that he was aware of the agreement and its existence at the time of signing while mixed in with other documents. [Husband] also testified that [he] believes that he is entitled to a half interest in the residential home which is titled to both parties.  There had also been a clear lack of full disclosure in the absence of the financial statements identifying the property to remain the separate and sole property of each along with [Husband] not being copied on all emails.  Such a lack of full disclosure also creates an unfairness, unreasonableness manifest inequity.

        The Court therefore find[s] that the postnuptial agreement although signed by the [Husband] was the product of unfairness not having an awareness of the meaning of a post nuptial agreement along with a lack of full disclosure as [Husband] was unaware of it[s] existence while signing other documents including the absence of the financial statements as attachments or exhibits identifying the property of each.  The Court therefore determine[s] the post nuptial agreement invalid or unenforceable with [Wife]'s request for legal costs is denied.

Appellant's App. pp. 8-10.   Additional facts will be provided where necessary.

# Discussion and Decision

## I. Standard of Review

[7]     Wife is appealing from a decision in which the trial court entered findings of fact and conclusions thereon.

In the instant case, the trial court entered special findings of fact and conclusions of law pursuant to Ind. Trial Rule 52(A). Therefore, our standard of review is two-tiered: we first determine whether the evidence supports the trial court's findings, and second, we determine whether the findings support the judgment. *Boonville Convalescent Center, Inc. v. Cloverleaf Healthcare Services, Inc.*, 834 N.E.2d 1116, 1121 (Ind. Ct. App. 2005), *reh'g denied, trans. denied*. Findings of fact are clearly erroneous when the record lacks any reasonable inference from the evidence to support them, and the trial court's judgment is clearly erroneous if it is unsupported by the findings and the conclusions which rely upon those findings. *Id*. In establishing whether the findings or the judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom. *Id*.

While conducting our review, we cannot reweigh the evidence or judge the credibility of any witness, and must affirm the trial court's decision if the record contains any supporting evidence or inferences. *Id*. However, while we defer substantially to findings of fact, we do not do so for conclusions of law. *Id*. We evaluate conclusions of law *de novo* and owe no deference to a trial court's determination of such questions. *Id*.

*Briles v. Wausau Ins. Cos.*, 858 N.E.2d 208, 212 (Ind. Ct. App. 2006). "Sua sponte findings control only as to the issues they cover, and a general judgment will control as to the issues upon which there are no findings." *Morgal-Henrich v. Henrich*, 970 N.E.2d 207, 210 (Ind. Ct. App. 2012) (citing *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997)).

[A]ppellate courts give considerable deference to the findings of the trial court in family law matters .... [T]rial courts must exercise judgment, particularly as to credibility of witnesses, and we defer to that judgment because the trial court views the evidence firsthand and we review a cold documentary record. Thus, to the extent credibility or inferences are to be drawn, we give the trial court's conclusions substantial weight. But to the extent a ruling is based on an error of

law or is not supported by the evidence, it is reversible, and the trial court has no discretion to reach the wrong result.

*MacLafferty v. MacLafferty*, 829 N.E.2d 938, 941 (Ind. 2005).

# II. Enforceability of Postnuptial Agreement

[8] Both this court and the Indiana Supreme Court have addressed the validity of postnuptial agreements several times. In each case, the reviewing court has begun its analysis by classifying the disputed postnuptial agreement as either a dissolution-settlement agreement or a reconciliation agreement. The outcome of this analysis determines the amount of discretion the trial court has to accept or reject the agreement.

> Turning to the merits, our first guidepost in this case is *Pond v. Pond*, 700 N.E.2d 1130 (Ind. 1998). There, the Indiana Supreme Court discussed the difference between "reconciliation agreements" and "dissolution settlements." *Id*. at 1132. The former are agreements (referred to as prenuptial, premarital, or antenuptial agreements) entered into in contemplation of marriage or its continuance and that generally must be enforced as written in the event of dissolution. *Id*. The latter are agreements entered into as a consequence of dissolution proceedings (post-nuptial agreements); they are governed by the Indiana Dissolution of Marriage Act ("the Act"), and their acceptance or rejection is within the trial court's discretion.

*Beaman v. Beaman*, 844 N.E.2d 525, 529 (Ind. Ct. App. 2006). Wife argues that the Agreement is a reconciliation agreement and, therefore, that the trial court's discretion to reject the Agreement was limited. Husband argues the Agreement is a dissolution settlement and, as such, the trial court had greater discretion to reject the Agreement.

We need not address this particular question as the outcome of this case would be the same regardless of the classification of the Agreement. Wife's analysis of the law on postnuptial agreements was artfully articulated and accurate; however, the facts of this case do not support her conclusion that the trial court exceeded its discretion in this instance. Even applying the more stringent discretionary standard used for reconciliation agreements, we find that the trial court was within its discretion to reject the agreement.

## A. Discretionary Standard for Reconciliation Agreements

Reconciliation agreements must generally be enforced as written and trial courts may only reject such agreements under a limited set of circumstances. *Pond*, 700 N.E.2d at 1132. Reconciliation agreements are valid and binding so long as they are entered into freely and fairly, without fraud, undue influence, duress, or misrepresentation, and are not, under the particular circumstances of the case, unconscionable. *Gaskell v. Gaskell*, 900 N.E.2d 13, 17 (Ind. Ct. App. 2009); *In re Marriage of Boren*, 475 N.E.2d 690, 695 (Ind. 1985); *Matter of Estate of Palamara*, 513 N.E.2d 1223, 1229 (Ind. Ct. App. 1987). In applying this standard, our courts have looked at whether the parties to a marital agreement received full disclosure of the nature and extent of the rights they waived via the agreement and whether the parties fully disclosed their assets prior to execution of the agreement. *Estate of Stack v. Venzke*, 485 N.E.2d 907, 910-11 (Ind. Ct. App. 1985). A marital agreement is unconscionable if "there was a gross disparity in bargaining power which led the party with the lesser bargaining power to sign a contract unwillingly or unaware of its terms and the contract is

one that no sensible person, not under delusion, duress or distress would accept." *Rider v. Rider*, 669 N.E.2d 160, 162 (Ind. 1996) (quoting *Justus v. Justus*, 581 N.E.2d 1265 (Ind. Ct. App. 1991)).

## B. Discretionary Standard Applied

Under the applicable standard of review, we "must affirm the trial court's decision if the record contains any supporting evidence or inferences." *Briles*, 858 N.E.2d at 212. Although there is conflicting evidence regarding Husband's subjective awareness of the Agreement, "we consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom," and "we cannot reweigh the evidence or judge the credibility of any witness." *Id*.

The Agreement was significantly unequal in its disposition of the marital assets, the Attorneys were acutely aware of this fact, and there were several emails between Wife and Attorneys which specifically addressed the unbalanced distribution and on which Husband was not copied. Despite the contentious and unbalanced nature of the Agreement, Attorneys agreed to represent Husband and Wife jointly and did not properly advise the parties of the apparent conflicts of interest. Husband claims that Attorneys breached the Indiana Rules of Professional Conduct Rule 1.7 by agreeing to represent the parties jointly and by failing to disclose conflicts of interests to Husband and/or

failing to obtain Husband's consent to the same.[2] Husband further claims that this created manifest inequities between the parties. The Rules of Professional Conduct are not law and whether an attorney breached the Rules is not determinative of the enforceability of a contract created as a consequence of an alleged breach. However, the fact that both Husband and Wife were represented by the same counsel indicates, at the very least, a lack of arms-length bargaining in the formation of the Agreement. As mentioned above, "[a] contract is unconscionable if there was a gross disparity in bargaining power which led the party with the lesser bargaining power to sign a contract unwillingly or unaware of its terms and the contract is one that no sensible person, not under delusion, duress or distress would accept." *Rider*, 669 N.E.2d at 162. Throughout their marriage, Husband relied heavily on Wife to handle the family's business affairs and she admitted to taking care of and advising Husband on the majority of those matters. Moreover, the Agreement was developed exclusively based on Wife's wishes. Wife testified that Husband did not ask for any changes or revisions to any of the executed documents with the exception of a preference on burial instructions in the event of his death.

---

[2] Husband highlights two potential conflicts of interest: (1) Attorneys' representation of both Husband and Wife in drafting the Agreement, and (2) Attorneys' representation of Wife and Wife's family on other matters while simultaneously representing Husband and Wife.

[13]     In its findings of fact, the trial court outlined evidence which suggested that Husband was unaware of the nature and terms of Agreement. Specifically, Husband claimed he was completely unaware of the Agreement prior to Wife's filing for dissolution, Husband did not complete the financial-declaration statements, the financial-declaration statements were unsigned and not attached to the Attorneys' copy of the Agreement, and it is unclear whether the financial-declaration statements were attached to the original executed Agreement. It is difficult to see how Husband could fairly be bound by an Agreement which repeatedly references attached financial statements that were not actually attached, particularly when it is the substance of those statements that determines the core of the Agreement (*i.e.*, what assets the parties would retain upon death or dissolution of marriage).

[14]     The trial court's factual findings indicate that the Agreement was not entered into fairly and was the product of a lack of full disclosure as to the nature and terms of the Agreement. To find otherwise would require this court to reweigh the evidence, which we will not do. Because the trial court's conclusion was supported by its findings, we cannot say that the judgment was clearly erroneous.

[15]     The judgment of the trial court is affirmed.

         Najam, J., and Robb, J., concur.