BOONVILLE CONVALESCENT CENTER, INC., Appellant–Plaintiff,

v.

CLOVERLEAF HEALTHCARE SERVICES, INC., Cloverleaf Healthcare of Boonville, In., Wanda Prock, Theodore E. Bruzas, Charline Bruzas, George A. Smith, Trela C. Smith, James L. Smith, Sharon K. Smith, William T. Rees, Helen L. Rees, Paul S. Hulse, Mihoko Hulse, Tim J. Shrout, Kimberly Shrout, Paul C. Ade, Ruth Ade, and Bruce H. Whitehead, Appellees–Defendants.

No. 32A05–0301–CV–44.

Court of Appeals of Indiana.

June 24, 2003.

J. Gordon Gibbs, Jr., Hinkle & Gibbs, Danville, IN, Gene R. Leeuw, John Mead, Leeuw Oberlies & Campbell, Indianapolis, IN, Attorneys for Appellant.

Malcolm C. Mallette, Brian C. Fritts, Krieg DeVault, LLP, Indianapolis, IN, Attorneys for Appellees.

## OPINION

BAKER, Judge.

Appellant-plaintiff Boonville Convalescent Center, Inc., (Boonville) appeals the trial court's grant of summary judgment entered in favor of the appellees-defen-

dants Cloverleaf Healthcare Services, Inc., (CHS), Cloverleaf Healthcare of Boonville, In. (CHB), Wanda Prock, Theodore and Charline Bruzas, George and Trela Smith, James and Sharon Smith, William and Helen Rees, Paul and Mihoko Hulse, Tim and Kimberly Shrout, Paul and Ruth Ade and Bruce H. Whitehead (collectively, the appellees). Specifically, Boonville contends that the trial court erred in determining, as a matter of law, that the appellees were no longer bound by, and had not breached, a lease agreement with Boonville. Thus, it claims that the above individuals remained personally liable under a guaranty they had executed with respect to the lease agreement that related to the operation of a nursing home facility. Boonville also contends that the trial court had erroneously determined that its efforts to mitigate damages had worked to release the appellees from their obligations under the lease. Concluding that the designated evidence failed to show that Boonville released the appellees from their obligations under the lease agreement, we reverse the trial court's entry of summary judgment.

### FACTS

Boonville owns certain real estate in Warrick County and all improvements on that property used in the operation of a 108–bed nursing home. On February 28, 1986, Boonville CEO Charles J. Ludwyck negotiated with various personnel at CHS regarding a twenty-year lease of the facility. Ludwyck emphasized to Roy L. Prock, one of CHS's shareholders, William Lee, the chief financial officer of CHS and Paul Ade, the president of CHS, that he would not lease the facility to CHS unless Prock and the other shareholders of the corporation, along with their spouses, personally guaranteed the lease. All three executives at CHS ultimately agreed to lease the center with that condition.

Ludwyck then signed the lease agreement at CHS's offices and the only attorney present during the final negotiation and execution of the lease agreement was William Rees, the in-house general counsel for CHS. Rees was also an officer, director, and shareholder of CHS and a cosigner of the lease agreement. When Ludwyck was presented a copy of the finalized lease agreement, he was specifically shown the first paragraph, which states that it was:

> Made by and between Boonville Convalescent Center, Inc., Charles J. Ludwyck, Chairman (hereinafter referred to as "Lessor"), and Cloverleaf Healthcare Services, Inc., and its personal guarantors, a corporation incorporated under the laws of the State of Indiana, (hereinafter referred to as the "Lessee").

Appellant's App. p. 74. The lease called for CHS, its co-signers, and its assignees/sublessees to pay monthly rent, real estate taxes, and insurance, to repair any damages, and to maintain the structural integrity of the premises for twenty years. Ade signed the agreement as president of CHS and in his individual capacity. Ade also signed his wife's name on the lease. All the other shareholders and their spouses executed the agreement, and those signatures were witnessed and notarized by either Rees or Billie Coffman, an employee of CHS. Rees not only signed and notarized the agreement, but also initialed every page of the lease terms, including the signature pages and most of the notary pages. Ade and Prock represented to Ludwyck that the lease agreement accurately represented all the terms of the lease, including the fact that the lease would be personally guaranteed by all the shareholders of the corporation and their spouses as Ludwyck had insisted during the negotiation phase.

On March 31, 1986, CHS assigned the lease to CHB, a newly organized corporation. This entity had the same officers, directors and shareholders as CHS. The personal guarantors of CHS reaffirmed under oath that they guaranteed the February 28, 1986 lease agreement.

Thereafter, on August 1, 1991, CHB subleased the premises to Sherwood Healthcare Corp., a newly created corporation that was owned and operated by CHS's in-house controller, William Robert Lee. CHB then assigned its interest as lessee/sublessor to BritWill Investments— Indiana LP, which subsequently assigned its lease and sublease to BritWill Healthcare Company,[1] which later changed its name to Raintree Healthcare Corporation.

On December 18, 1992, in order to induce National City Bank to consent to the assignment of the lease to Sherwood Healthcare Corp., Roy and Wanda Prock, Theodore and Charline Bruzas, George and Trela Smith, and Timmy and Kimberly Shrout all confirmed that their obligations under the lease dated February 28, 1986, were joint and several and that their obligations thereunder remained in full force and effect.

The shareholders of CHS and each of their spouses also executed a notarized document confirming that they each signed the earlier February 28, 1986 Boonville lease agreement "with the intention of guaranteeing the obligations of Cloverleaf Healthcare Services, Inc." Appellant's App. p. 358. As a part of the document, the individual signatories "[w]ithout either adding to or subtracting from the existing guarantees of the Lease Agreement ... individually, jointly and severally" admitted that they "unconditionally guaran-

tee[d]" the obligations under the Lease Agreement. Appellant's App. p. 358.

Thereafter, in 1994, CHB belatedly asked Boonville to consent to the BritWill assignments. The Procks, Bruzas and the Shrouts all reaffirmed their Guaranties of the Boonville Lease agreement as follows:

6. All parties hereby agree that by signing the Consent to Assignment, Lessor does not release the personal guarantors to the Lease ("Guarantors") and each Guarantor's personal guaranty shall remain in effect throughout the remaining term of the lease.

Appellant's App. p. 284.

*GUARANTORS' REAFFIRMATION*

In order to induce Lessor to execute and deliver its Consent to Assignment and Leasehold Mortgage and with the intent that Lessor rely hereon, each of the undersigned does hereby confirm that his or her, as the case may be, obligations under the Lease ... are joint and several and are not and shall not be diminished or impaired in any respect by virtue of the aforementioned consent to Assignment and Leasehold Mortgage or the consummation of any transaction referred to therein or in any way related thereto and all such obligations remain in full force and effect. This confirmation of obligations is executed and delivered effective as of November 25, 1992.

Appellant's App. p. 289–90. Ludwyck then signed the agreements and they were ultimately delivered to CHS.

Sometime in February 2000, Boonville was notified by a representative from the Raintree Healthcare Corporation that

---

1. Third-party defendant Bruce Whitehead was the general partner of BritWill Investments– Indiana, LP, and the chairman of both Brit-

Will Healthcare Company and BritWill Investments–I, Inc.

BritWill/Raintree[2] would be filing for bankruptcy on February 29, 2000. James Fields from BritWill/Raintree informed Boonville that unless Boonville took control of the facility, BritWill/Raintree would reject the lease and immediately notify the Indiana Department of Health to close the facility and relocate the patients. Upon receiving this information, Ludwyck contacted Boonville's legal counsel, whereupon they contacted Rees, CHS's general counsel and a co-signer of the lease agreement and informed him of the situation. CHS and its personal guarantors were called upon to honor their assumption obligations under the lease agreement and take control of the facility. Rees eventually indicated that the guarantors would not operate the nursing home.

Just before the bankruptcy petition was filed, it was determined that BritWill/Raintree had not paid its employees who were working at the Boonville facility for some time. Specifically, it was discovered that BritWill/Raintree owed the employees approximately $60,000 in wages and taxes. BritWill/Raintree filed a motion for court approval of the rejection of the Boonville facility sublease, detailing for the Bankruptcy Court its justification for having rejected the Lease. It stated as follows:

> RainTree cannot continue to operate the Boonville facility. The lessor, Boonville Convalescent Center, Inc., has agreed to assume responsibility for payroll and patient care by midnight tonight if it is unable to engage an alternative operator, lessee or purchaser, expressly reserving all its claims against the Debtors and the guarantors of the lease.

Appellant's App. p. 415–16, 418–23.

At a hearing conducted by the bankruptcy court on March 3, 2000, BritWill/Raintree sought leave from the court to borrow funds from Omega Healthcare to pay prepetition payroll only to the employees of facilities that Omega would take over. Because Omega would not take over the Boonville facility, BritWill/Raintree did not want to pay the delinquent wages and taxes due its employees who were working at Boonville. Boonville objected and argued that if the debtor was going to borrow money post-petition to pay pre-petition wages, it should pay back wages for all facilities. BritWill/Raintree agreed, and Boonville withdrew its objection to the petition to pay back wages to the employees of other facilities.

When the nursing home was abandoned in the winter of 2000, CHS's assignee left the facility in an extreme state of disrepair with 67 patients in residence. Boonville maintained that the areas of disrepair included the air conditioning and electrical systems, certain concrete areas, drainage units, carpeting, wall coverings, parking lots, furniture and other equipment. In an effort to mitigate the damages resulting from the breach of the lease, Ludwyck operated the facility as Southwind Healthcare, Inc. (Southwind) on a purely temporary basis while continuing to look for a permanent tenant or buyer. Ludwyck had formed Southwind with his wife, and they were the sole shareholders of that corporation. He advised CHS, its co-signers and their legal counsel of its actions and intentions.

On February 29, 2000, Southwind and BritWill/Raintree, the sub-tenant, executed an agreement regarding the transfer of the facility. BritWill Indiana Partnership was the assignee of the lease and Ludwyck was the lessor. In accordance with that

---

**2.** Raintree and BritWill are related entities. For purposes of clarity, we refer to these entities as BritWill/Raintree.

agreement, BritWill/Raintree stated that it "will reject its lease and all right title and interest to the use and possession of the real and personal property." Appellant's App. p. 501. Nowhere in the agreement does it indicate that either Boonville or Southwind released BritWill/Raintree from any obligations under the initial lease agreement. Ludwyck ultimately drafted correspondence to the Indiana Department of Health informing the State that Southwind would operate the facilities.

In the preamble to the lease between Southwind and Boonville, the parties stated that the lease "is intended to be a temporary lease to mitigate damages and to provide for the deferred maintenance, repair, management, and operation of the convalescent center ... during the period of time that the parties hereto are seeking a third party to purchase or lease the Convalescent Center." Appellant's App. p. 114. Thereafter, a letter was sent to the Procks and others, demanding that CHS and its guarantors assist in Boonville's efforts to locate a permanent operator and replacement tenant for the facility, and that the guarantors pay all amounts due under the lease. Boonville's legal counsel then sent a letter to Rees, indicating, among other things, that there should be continued liability on the part of the guarantors, and he threatened to pursue litigation for the enforcement of the guaranties. Eventually, on August 14, 2000, Boonville filed a claim in the BritWill/Raintree bankruptcy, seeking the rent, real estate taxes, and insurance payments that were due or to become due under the lease agreement.

Thereafter, on August 22, 2000, Boonville filed its complaint against the appellees,[3] claiming that they were liable for payments under the lease because they had acted as guarantors under the 1986 lease agreement. In response, the appellees eventually filed a motion for summary judgment as to the issue of the release of the guarantors on September 6, 2002. Following a hearing, the trial court granted the motion for summary judgment on December 12, 2002. In its order, the trial court determined, among other things, that:

> (4) Pursuant to an Agreement dated February 29, 2000, ... the chain of title for the leasehold was broken by Southwind, with the assistance and approval of Plaintiff, contracting directly with BritWill/Raintree for transfer of the Leasehold to Southwind effective at 11:59 p.m. on February 29, 2000.

> (5) At 11:59 p.m. on February 29, 2000, BritWill/Raintree also transferred to Southwind the operations of the Nursing Home, and all property being utilized in the operation of the Nursing Home.

> (6) On March 3, 2000, Plaintiff/Southwind appeared through counsel in the Raintree bankruptcy, and in cooperation with BritWill/Raintree, obtained Bankruptcy court approval for the transfer of the nursing Home, pursuant to the Agreement.

> After considering the foregoing facts, ... the court is of the opinion that there was a surrender and acceptance of the Lease on February 29, 2000.

Appellant's Br. p. 55. In the end, the trial court found that "[a]ll lessees and earlier sub-lessees in the chain of assignments were released by the termination of the Lease, by the modification of the Lease and by the failure of the lessor to give proper notice." Appellant's App. p. 65. Concluding that there was "no just reason for delay," Appellant's App. p. 50, the trial

---

**3.** On September 28, 2000, Boonville amended its complaint as of right, adding Sherwood Healthcare Services, Inc. as a defendant. Appellant's App. p. 8.

court entered the order as a final judgment. Boonville now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

In reviewing the grant or denial of a motion for summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *Smith v. Allstate Ins. Co.*, 681 N.E.2d 220, 223 (Ind.Ct.App.1997). We do not weigh evidence, but will liberally construe the facts in the light most favorable to the nonmoving party. *General Motors Corp. v. Northrop Corp.*, 685 N.E.2d 127, 132 (Ind.Ct.App.1997), *trans. denied.* Summary judgment should be granted only when the designated evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). On appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *City of Elkhart v. Agenda: Open Government, Inc.*, 683 N.E.2d 622, 625 (Ind.Ct.App. 1997), *trans. denied.* The party appealing the grant of summary judgment has the burden of persuading this court on appeal that the trial court's ruling was improper. *Jordan v. Deery*, 609 N.E.2d 1104, 1107 (Ind.1993).

If we have any doubts concerning the existence of a genuine issue of material fact, we must resolve those doubts in favor of the nonmoving party and reverse the entry of summary judgment. *McGee v. Bonaventura*, 605 N.E.2d 792, 793 (Ind.Ct. App.1993). A fact is material for summary judgment purposes if its resolution is decisive of either the action or a relevant secondary issue. *N. Ind. Pub. Serv. Co. v. E. Chicago Sanitary Dist.*, 590 N.E.2d 1067, 1072 (Ind.Ct.App.1992). A factual issue is genuine if those matters properly considered under T.R. 56 evidence a factual dispute requiring the trier of fact to resolve the opposing parties' different versions. *Id.*

### II. Boonville's Claims

#### A. Release of Obligations Under the Lease

Boonville contends that the trial court erred in determining as a matter of law that it released the appellees from their obligations under the lease because it operated the nursing home following Brit-Will/Raintree's abandonment of the premises. Specifically, Boonville argues that the summary judgment ruling should be set aside because the designated evidence established that it was never its intent to release the defendants from their guaranties.

In resolving this issue, we note that in determining whether a landlord has accepted the surrender of a lease and released the tenant from liability, the court must examine the acts of the parties. *Mileusnich v. Novogroder Co.*, 643 N.E.2d 937, 939 (Ind.Ct.App.1995). As we observed in *Grueninger v. Lake County Trust Co.*, 413 N.E.2d 1034, 1038–39 (Ind. Ct.App.1980):

> An express surrender is an agreement by the parties, which is usually required to be in writing and must be supported by consideration.
>
> . . . .
>
> A surrender will arise by operation of law when the parties to a lease do some act so inconsistent with the subsisting relation of landlord and tenant as to imply they have both agreed to consider the surrender as effectual. Thus, a surrender cannot be effected by the actions of only one party; therefore, a surrender may not be forced upon a landlord by the unilateral actions of the tenant.

To constitute a surrender by operation of law, there must be some decisive, unequivocal act by the landlord which manifests the lessor's acceptance of the surrender. The resolution of whether there has been such a surrender and acceptance will be determined on a case by case basis by examining the acts of the respective parties in each case.

Additionally, reletting the premises by the landlord will not constitute a surrender by operation of law. *Id.* at 1043.

In reviewing the acts of the parties in these circumstances, the designated evidence fails to show that Boonville acted in any manner that would manifest acceptance of a surrender of the 1986 lease so as to release the obligor and/or assignee under that lease. When Boonville received notice that BritWill/Raintree was abandoning the nursing home, a period of six years remained on the term. The resident occupancy had decreased approximately forty percent from the time of the original lease and the home had fallen into a state of disrepair.

■ On February 29, 2000, Boonville contacted William Rees, who was Cloverleaf's in-house counsel as well as one of the lease co-signers, and left word that BritWill/Raintree was abandoning the nursing home and that CHS and its co-signers should arrange to run the facility and care for the sixty-seven residents. Appellant's App. p. 393, 415. Boonville sent numerous demand letters to CHS, its counsel and the co-signers on the lease. Appellant's App. p. 398–99, 401–02, 424–26. Moreover, Boonville stressed to BritWill/Raintree that it was expressly reserving "any and all rights and claims under the existing lease including any claim against guarantors of the lease." Appellant's App. p. 396. Curiously, BritWill/Raintree expressly acknowledged Boonville's position when it filed its motion to approve its rejection of

the lease. That is, BritWill/Raintree acknowledged that Boonville was "expressly reserving all its claims against the Debtors and the guarantors of the lease." Appellant's App. p. 422. Boonville also filed a claim in the Roy Prock estate for the damages resulting from the breach of the lease agreement and a claim in the BritWill/Raintree bankruptcy and ultimately had to file the present lawsuit.

In light of such designated evidence, it is apparent that Boonville did not intend to release BritWill/Raintree, never considered that entity or the other lessees, co-signers, sublessees, and assignees released from their obligations under the lease and committed no act manifesting a contrary intent. To be sure, Boonville continued operation of the nursing home to avoid decertification as well as the possible loss of its license by the State. Moreover, it was Boonville and Ludwyck who made the necessary repairs simply to preserve the building's viability as a nursing home and to mitigate damages following Boonville's repeated oral and written demands that the appellees honor their obligations under the lease. In the event that Boonville had released the appellees, it would have been left to operate a nursing home in extreme disrepair that was nearly forty percent vacant. In light of these circumstances, we must conclude that the trial court's determination that Boonville's actions constituted a release of the appellees from the contract as a matter of law is not supported by the facts or any logical inference that could be drawn from the designated evidence.

### B. Guaranty

In a related argument, Boonville urges that the co-signers on the lease must be held personally liable as guarantors under the contract. Inasmuch as the co-signers are identified as CHS's "personal guarantors," the provisions of the contract state

that the terms of the lease are binding on heirs and personal representatives and their signatures are notarized, the inescapable conclusion that must be reached, argues Boonville, is that the co-signers agreed to be bound by all terms of the lease.

■ In resolving this issue, we note that a guaranty has been defined as a contract by which the guarantor undertakes in writing, upon sufficient consideration, to answer for the debt of another person. *Davis v. B.C.L. Enter., Inc.*, 406 N.E.2d 1204, 1205 (Ind.Ct.App.1980). Our Statute of Frauds provision set forth in Indiana Code section 32–21–1–1 requires a guaranty contract to be written. When a guaranty is executed contemporaneously with the contract it supports, no separate consideration is required for the guaranty. *Davis*, 406 N.E.2d at 1205.

■ In the instant case, the lease agreement named "Cloverleaf Healthcare Services, Inc. and its personal guarantors" as the "Lessee." Appellant's App. p. 157. Another section of the agreement provided that the lease agreement was to "extend to and be binding upon the heirs, personal representatives, successors and assigns of the parties." Appellant's App. p. 167. The agreement also identifies the principal obligor, CHS, the guarantors, the shareholders and their spouses, and identifies Boonville as the beneficiary of the guaranty. Appellant's App. p. 157–78. The guaranty was in writing, was executed contemporaneously with the lease agreement and it defined the obligations that were to be guaranteed. The identification of the co-signers as Cloverleaf's personal guarantors, the signature pages, the notarization of those signatures and the initialing of the signature pages by their counsel necessarily lead to the conclusion that the co-signers guaranteed payment under the lease and agreed to be bound by its terms. Put

another way, the co-signers have, through their own words and signatures, admitted that they were personal guarantors. Thus, the trial court's grant of summary judgment to the appellees on this basis was erroneous.

## CONCLUSION

In light of our discussion above, we conclude that the designated evidence fails to demonstrate that Boonville released the appellees from their obligations under the lease agreement. Additionally, we note that the CHS entities are liable because BritWill/Raintree, as the assignee, breached the lease by rejecting it in bankruptcy. Finally, we conclude that the co-signers on the lease are liable and they may not escape liability in light of the signatures, acknowledgments, assertions and reaffirmations that were executed at various times during the life of the contract. Thus, we reverse the entry of summary judgment for the appellees and remand this cause to the trial court with instructions that it enter judgment for Boonville on the issue of liability under the lease and to hold a hearing for a determination of damages.

Reversed and remanded.

SULLIVAN, J., and DARDEN, J., concur.