


FILED

Apr 23 2026, 8:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Court of Appeals of Indiana

Tradewinds Holding Company, Inc.,

*Appellant-Defendant*

v.

CPUS Anson Building 8A, LP,

*Appellee-Plaintiff*

---

April 23, 2026

Court of Appeals Case No.
25A-PL-347

Appeal from the Boone Superior Court

The Honorable Matthew C. Kincaid, Judge

Trial Court Cause No.
06D01-2308-PL-1115

---

**Opinion by Judge Scheele**
Judges Brown and Felix concur.

**Scheele, Judge.**

## Case Summary

[1]    CPUS Anson Building 8A, LP (Anson) sued Tradewinds Holding Company, Inc. (Tradewinds) for Tradewinds' breach of their lease agreement and sought damages. Anson filed a motion for summary judgment, which the trial court partially granted in favor of Anson on its breach claim. Following a subsequent hearing on damages, the court awarded Anson over $3.5 million plus attorneys' fees, costs, and post-judgment interest. Tradewinds appeals, raising two issues for our review: (1) whether the trial court erred in granting partial summary judgment in favor of Anson; and (2) whether the trial court abused its discretion in awarding damages. Because the designated evidence proves Tradewinds breached its lease with Anson, but the trial court erred in its calculation of damages, we affirm in part, reverse in part, and remand with instructions.

## Facts and Procedural History

[2]    On January 15, 2021, Anson agreed to lease an industrial space located in Whitestown (the Premises) to Tradewinds. According to the Industrial Space Lease (the Lease), the Lease term was to run from February 1, 2021, until February 28, 2026 (the Term). The Lease required Tradewinds to pay monthly base rent and additional rent, including taxes and operating costs, (collectively, Rent), on or before the first day of each month. Any Rent not paid within five days after the due date incurred a five percent late fee on the overdue amount, plus interest at the "Default Rate" of eighteen percent per annum. App. Vol. II

p. 28. A "default" included "fail[ure] to pay when due any installment or other payment of Rent[.]" *Id.* at 45.

[3] On August 17, 2023, Anson sued Tradewinds for breach of the Lease and sought prejudgment possession of the Premises, damages, attorneys' fees, costs, and interest. The parties reached an agreement on possession, and Tradewinds vacated the Premises in October 2023.

[4] On April 25, 2024, Anson filed a motion for summary judgment on its breach claim and for damages. In support of this motion, Anson designated the Lease; an affidavit of indebtedness from Leah Fantin, Anson's real estate manager; accounting ledgers for Tradewinds' paid and unpaid past rent, future rent, and cumulative interest; accounting records for rental income from Anson's replacement tenant, Rockwell Automation (Rockwell); and an affidavit for attorneys' fees.

[5] On June 4, Tradewinds filed a response and brief in opposition to Anson's motion. Tradewinds designated Anson's August 2023 unverified complaint; its Answer; all exhibits attached to all pleadings; and an affidavit from Brian Cook, Tradewinds' owner.

[6] On July 8, Anson filed a reply brief in support of its motion and a supplemental affidavit of indebtedness correcting the amount of Rent allegedly owed by

Tradewinds. Anson amended its supplemental affidavit on July 11 to add updated accounting records for the corrected Rent-owed figures.[1]

[7] The trial court granted partial summary judgment in favor of Anson on its breach claim and set a damages hearing on December 12 "on the amount due and owing[.]"[2] *Id.* at 6. Fantin testified for Anson, and Cook testified for Tradewinds. After reviewing the evidence and the parties' proposed orders, the court issued a written order adopting Anson's proposed findings and conclusions. The court awarded Anson damages in the principal amount of $3,559,407.17, plus post-judgment interest at the statutory rate, attorneys' fees, and costs. This appeal ensued. Additional facts are provided as necessary.

## Discussion and Decision

### I. Summary Judgment

[8]  "We review summary judgment de novo, applying the same standard as the trial court[.]" *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). "The moving

---

[1] At the hearing on Anson's summary judgment motion, Tradewinds moved to strike Anson's reply brief and supplemental affidavit, arguing the timing was improper and Anson should have requested leave of the court before filing. The court took the motion under advisement but apparently never ruled on the motion to strike, and Tradewinds never sought any further remedy. The reply brief and supplemental affidavits, therefore, remain in the record. We note, however, the timely filing of a reply brief and supplemental affidavit is permissible without leave of court, but the admission of such supplemental evidence is within a trial court's discretion. *See Luse Thermal Techs., LLC v. Graycor Indus. Constructors, Inc.*, 221 N.E.3d 701, 712 (Ind. Ct. App. 2023) (holding same), *trans. denied*.

[2] The court did not issue a written order granting summary judgment; rather, it issued a notice via the Chronological Case Summary stating, "The Court now finds that [Anson's] Motion for Summary Judgment is meritorious in part. The Court now enters summary judgment in [Anson's] favor." App. Vol. II p. 6. The court then set a hearing to consider damages. The parties do not challenge this procedure on appeal.

party bears the initial burden of making a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law." *Manley v. Sherer*, 992 N.E.2d 670, 673 (Ind. 2013) (internal quotations and citation omitted). "Summary judgment is improper if the moving party fails to carry its burden, but if it succeeds, then the non-moving party must come forward with evidence establishing the existence of a genuine issue of material fact." *Id.* Summary judgment is proper only "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Hughley*, 15 N.E.3d at 1003.

We construe all factual inferences in favor of the nonmoving party and resolve all doubts as to the existence of a material issue against the moving party. *Manley*, 992 N.E.2d at 673. Our review of a summary judgment is limited to those materials designated to the trial court. *Id*. "In reviewing a trial court's ruling on a motion for summary judgment, we may affirm on any grounds supported by the Indiana Trial Rule 56 materials." *Flannagan v. Lakeview Loan Servicing, LLC*, 184 N.E.3d 691, 695-96 (Ind. Ct. App. 2022) (citation omitted).

Anson sought summary judgment in relevant part on its claim for Tradewinds' breach of the Lease. We "construe a lease in the same manner as any other contract." *Sisters of St. Francis Hosp. Servs., Inc. v. EON Props., LLC*, 968 N.E.2d

305, 311 (Ind. Ct. App. 2012). "Construction of written contracts is generally a question of law for which summary judgment is particularly appropriate." *Id.* "We review questions of contract interpretation de novo." *Decker v. Star Fin. Grp., Inc.*, 204 N.E.3d 918, 921 (Ind. 2023).

> In interpreting a contract, we ascertain the intent of the parties at the time the contract was made, as disclosed by the language used to express the parties' rights and duties. We look at the contract as a whole ... and we accept an interpretation of the contract that harmonizes all its provisions. A contract's clear and unambiguous language is given its ordinary meaning. A contract should be construed so as to not render any words, phrases, or terms ineffective or meaningless.

*Ryan v. TCI Architects/Eng'rs/Cont'rs, Inc.*, 72 N.E.3d 908, 914 (Ind. 2017) (internal citations omitted).

[11] To prevail on its motion for summary judgment, Anson had to show a contract existed, Tradewinds breached the contract, and it was entitled to damages. *See Ind. Bureau of Motor Vehicles v. Ash, Inc.*, 895 N.E.2d 359, 365 (Ind. Ct. App. 2008) (providing the elements of a breach of contract claim), *reh'g. denied.* The parties do not dispute the existence of the Lease or Tradewinds' obligation to pay Rent, which Anson showed by designating the Lease in support of its motion.

[12] Considering the summary judgment materials and designated evidence in the light most favorable to Tradewinds, Anson demonstrated Tradewinds "is indebted to [Anson] for unpaid rental obligations" and is "in default of its

obligations under the Lease." App. Vol. II pp. 99, 88. In addition to the Lease and Leah Fantin's affidavit, Anson designated initial accounting documentation showing Tradewinds breached the Lease by not paying all Rent due from April 2022 to at least February 2024 when Anson obtained a new tenant. *See id.* at 101, 104. On its face, Anson's designated materials showed Tradewinds defaulted on its obligation to pay Rent, thereby breaching the contract and creating damages.

[13] In response to Anson's motion, Tradewinds disputes the amount of Rent it owed Anson. Specifically, Tradewinds' owner, Brian Cook, swore that "[a]pproximately one-half of the amount alleged as unpaid was actually paid." *Id.* at 125. Tradewinds does not dispute that its failure to pay the remainder of Rent due was a default under the Lease. Tradewinds also designated all exhibits attached to the pleadings, which included December 2022 and August 2023 default notices and an August 2023 notice of termination of possession that Anson sent to Cook. Because Tradewinds' designated evidence confirms that it breached the Lease and owed at least some unpaid Rent, Tradewinds failed to establish a genuine issue of material fact relevant to its liability for breach.

[14] Notwithstanding its effective admission of default, Tradewinds argues it was engaged with Anson in the process of assigning the Lease during the summer of 2023 and the evidence "raises a genuine issue of material fact as to whether this process occurred." Appellant's Br. p. 14. Article 16 of the Lease provided Tradewinds could sublease or assign the Lease if it so "desire[d] to effect a Transfer and introduce[d Anson] to a proposed assignee, sublessee or

replacement tenant[.]" App. Vol. II p. 42. The parties dispute whether Tradewinds was required to give written notice of its desire to assign the Lease, but Tradewinds asserts it sufficiently expressed its desire to assign the Lease through its conduct. Thus, Tradewinds contends Anson was required to provide prompt notification of its decision under Article 16: that is, whether Anson consented to the assignment; declined to consent with supportive reasoning; or opted to cancel the Lease and relet the Premises to another tenant "at [Anson's] expense and without any liability to [Tradewinds]." *Id.*

[15] But this argument does not present a genuine issue of material fact as to Tradewinds' breach of the Lease. First, nothing in Article 16 released Tradewinds from its obligations to pay Rent during the assignment process. Second, even if it were undisputed—which it is not—that the parties were engaged in procuring an assignment and that Anson chose the third option, to cancel the Lease and to relet to another tenant, Article 16 only contemplates that *the cost of Lease cancelation and reletting* the Premises would be "at [Anson's] expense and without any liability to [Tradewinds]." *Id.* The unambiguous language of Article 16 does not release Tradewinds of its unpaid Rent obligations or other liabilities arising from its default.

[16] Finally, Article 16 provides that any assignment made "while [Tradewinds] is in default under this Lease, irrespective of whether [Anson's] consent is required hereunder with respect to the [assignment], shall be voidable by [Anson] in [Anson's] sole discretion." *Id.* at 43. Thus, even if the parties were engaged in the assignment process, it was within Anson's sole discretion to void

the assignment due to Tradewinds' existing default. The fact that discussion of a possible assignment may have occurred would not obviate Anson's breach claim. Partial summary judgment in favor of Anson on the issue of liability for breach of the Lease was appropriate.

## II. Damages

[17] Tradewinds also contends the trial court erred in calculating damages.[3] "In a breach of contract case, the measure of damages is the loss actually suffered by the breach." *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 507 (Ind. Ct. App. 2007). We review an award under an abuse of discretion standard. *Ind. Bureau of Motor Vehicles*, 895 N.E.2d at 368. Although "[o]ur review of a damages award is limited[,]" "the non-breaching party is not entitled to be placed in a better position than he would have been if the contract had not been broken." *Four Seasons Mfg., Inc.*, 870 N.E.2d at 507. "We do not reweigh the evidence or judge the credibility of witnesses, and we will reverse an award only when it is not within the scope of the evidence before the finder of fact." *Id.* "However, '[t]he damage award cannot be based on speculation, conjecture, or surmise, and must be supported by probative evidence.'" *Id.*

---

[3] We note Anson's position that Tradewinds waived certain arguments regarding damages by raising them for the first time on appeal. In our view, the record clearly demonstrates that Tradewinds challenged the total damages based on multiple interpretations of the Lease. We find Tradewinds' arguments sufficiently preserved and exercise our discretion under Indiana Appellate Rule 1 to address any arguments if they were waived.

(quoting *Whitaker v. Brunner*, 814 N.E.2d 288, 296 (Ind. Ct. App. 2004), *trans. denied*).

[18] Here, the damages were contractual in nature, and the alleged errors in their calculation stem from interpretations of the Lease. Generally, recovery for breach of contract includes "damages that may reasonably be considered to . . . have been in contemplation of the parties at the time they entered the contract as a probable result of [a] breach." *Orto v. Jackson*, 413 N.E.2d 273, 278 (Ind. Ct. App. 1980); *see also Hadley v. Baxendale,* 9 Ex. 341, 156 Eng. Rep. 145 (1854). The remedies available upon default were contemplated by the parties at the time they entered the contract and were memorialized in Article 20 of the Lease. The interpretation of contracts, such as a lease, "is a pure question of law, and we review such questions de novo." *Four Seasons Mfg., Inc.*, 870 N.E.2d at 503; *see* ¶10 *supra*.

[19] As an initial matter, we note Tradewinds' concern that the trial court adopted Anson's proposed findings and conclusions verbatim. "[W]e do not prohibit the practice of adopting a party's proposed findings. But when this occurs, there is an inevitable erosion of the confidence of an appellate court that the findings reflect the considered judgment of the trial court." *Mega Oil, Inc. v. Citation 2004 Investment, LLC*, 211 N.E.3d 528, 538-39 (Ind. Ct. App. 2023) (citation omitted), *trans. denied*. But "the critical inquiry is whether such findings, as adopted by the court, are clearly erroneous[.]" *Id.* at 539.

[20]     The trial court calculated damages as follows:

| | |
|---|---|
| All Rent from April 2022 (date of first breach) through February 2026 (end of Lease Term) accelerated from April 2022 (including a 5% late fee and operating expenses for every month except May 2022, including future owed months) | $2,585,984.93 |
| Recovery, repair, and reletting expenses accrued in late 2023-early 2024, accelerated from April 2022 | + $1,070,062.97 |
| | = 3,656,047.90 |
| Interest on the above total compounded monthly at 1.5% per month (18% annually) from April 2022 through December 2024 (date of trial) | + $2,319,686.29 |
| | = $5,975,734.20 |
| Unpaid utilities | + $4,880.67 |
| | = $5,980,614.87 |
| Collected Rockwell rent from February 2024 through December 2024 and expected Rockwell rent from January 2025 through February 2026 | - $2,421,207.70 |
| Total damages before post-judgment interest | = $3,559,407.17 |

App. Vol. II pp. 11-13.[4]

[21]     Tradewinds contends the trial court misinterpreted multiple provisions of the Lease, primarily those under Article 20, Remedies of Landlord. Thus, Tradewinds concludes the court abused its discretion in calculating damages. We address each challenged interpretation and calculation in turn.

---

[4] The damages actually total $3,559,407.16, but our recitation above reflects the trial court's order.

## A. Acceleration of Rent and Repairs and Leasing Costs

[22] Tradewinds asserts the court erred by accelerating all Rent and repairs and leasing costs from April 2022 and in calculating interest on the cumulative balance from that date forward. In pertinent part, the court concluded:

> 14. Because all Rent owed through the end of the Lease term became due at the time of [Tradewinds'] first breach in April 2022, interest for the full amount owed through the end of the Lease, $3,656,047.90 ($2,585,984.93 in Rent plus $1,070,062.97 in repairs and leasing costs), became due on April 1, 2022.

*Id.* at 11.

[23] Our review of the Lease, however, does not reveal any provision that accelerated all Rent and repairs and leasing costs to the date of Tradewinds' first breach. Article 20 of the Lease provides, in relevant part:

> Upon the occurrence of any default, Landlord may, at its option and without further notice to Tenant and without judicial process, in addition to all other remedies given hereunder or by law or equity, do any one or more of the following:
>
> ***
>
> (b) With or without terminating this Lease, Landlord may re-enter the Premises, remove Tenant, or cause Tenant to be removed from the Premises in such manner as Landlord may deem advisable under applicable Law . . . .
>
> ***

(e) If Landlord, without terminating this Lease, shall re-enter the Premises . . . :

> (i) All Rent due from Tenant to Landlord shall thereupon become due and shall be paid up to the time of re-entry, dispossession or expiration and Tenant shall pay to Landlord the sum of (1) the cost of recovering the Premises, (2) the cost of repairing any damage to the Premises, and (3) any other damages or relief which Landlord may be entitled to at law or in equity. In no event shall Landlord have any obligation to refund to Tenant any Rent prepaid on this Lease, irrespective of whether Landlord relets all or any portion of the Premises following a default.

*Id.* at 46. Tradewinds concedes that "these subparagraphs contemplate an acceleration of the rent due" but asserts Rent should not accelerate from the date of its first breach. Appellant's Br. p. 26.

[24] It is undisputed that Anson opted to re-enter the Premises without terminating the Lease, so we interpret Article 20(e)(i) in light of Anson having exercised that option. The Merriam Webster Dictionary defines "thereupon" as "on that matter," "therefore," or "immediately after that." Merriam-Webster, THEREUPON Definition & Meaning - Merriam-Webster [https://perma.cc/2V7T-ALCC] (last visited April 9, 2026). Applying the plain meaning of this term, it is clear that whatever Rent was contemplated by Article 20(e)(i) became due immediately after Anson re-entered, not immediately after a breach occurred. Thus, it was error to accelerate Rent from April 2022

because the Lease does not contemplate acceleration from the date of Tradewinds' first breach.

[25] Tradewinds contends the triggering event, i.e. re-entry, occurred in October 2023. Anson sent Tradewinds a "Notice of Termination of Possession" on August 15, 2023, immediately terminating Tradewinds' possession. Ex. Vol. I p. 198. Although this notice sufficiently constitutes dispossession to trigger acceleration under Article 20(e)(i), the parties later agreed Tradewinds would vacate and Anson would re-enter the Premises in October 2023. Based on this conduct of the parties, we also treat October 2023 as the date of re-entry. *See SWL, L.L.C. v. NextGear Capital, Inc.*, 131 N.E.3d 746, 753 (Ind. Ct. App. 2019) (contract modification can be implied from parties' conduct; the relevant intent in contract matters is the parties' outward manifestations of contract terms).

[26] Tradewinds concedes that in "October 2023 [] a situation ar[o]se where rent could be accelerated pursuant to Article 20(e)(i) of the Lease." Appellant's Br. p. 27. However, in its reply brief, Tradewinds contends that only the Rent payable "up to" the date of re-entry could be accelerated. Appellant's Reply Br. p. 13. But if that were correct, it would render Article 20(e)(i) not an acceleration clause at all, i.e., the date acceleration was triggered would be the same date through which Rent owed was accelerated. In effect, no Rent would accelerate.

[27] The Lease defines "Rent" as:

> Monthly Rent, Additional Rent and any other amounts which Tenant is or becomes obligated to pay Landlord under this Lease are herein referred to collectively as "**Rent**," and all remedies applicable to the nonpayment of Rent shall be applicable thereto. Landlord may apply payments received from Tenant to any obligations of Tenant then accrued, without regard to such obligations as may be designated by Tenant.

App. Vol. II p. 28 (emphasis in original). "Monthly Rent" refers to the base rent due each month through the end of the Lease Term as "stated in Article 1.K" of the Lease, and "Additional Rent" refers to "[a]ll costs and expenses which Tenant assumes or agrees to pay and any other sum payable by Tenant pursuant to this Lease, including, without limitation, Tenant's Pro Rata Share of Taxes and Operating Expenses under Article 4[.]" *Id.* at 27-28.

[28] The terms "[a]ll Rent" as used in Article 20(e)(i) thus included Monthly Rent owed through the end of the Term and Additional Rent that Tradewinds was obligated to pay. *Id.* at 46. Therefore, we conclude the intent of the parties was that all future Rent due through the end of the Lease Term would be accelerated from and paid by the date of re-entry, October 2023. Thus, all pre-October 2023 Rent was owed as it became due, and all remaining Rent owed through the end of the Lease Term became due in October 2023 upon Anson's re-entry.

[29] Article 20(e)(i) also provides that Tradewinds "shall pay . . . the sum of" recovery and repair costs and any other damages Anson may be entitled to at law or in equity. *Id.* Because these damages are among the "remedies applicable

to the nonpayment of Rent[,]" they are applicable to "Rent" as defined by the Lease. *Id.* at 28. In addition, Article 20(e)(ii) provides:

> Landlord, without any obligation to do so, may relet the Premises or any part thereof for a term or terms which may at Landlord's option be less than or exceed the period which would otherwise have constituted the balance of the Term and may grant such concessions in reletting as Landlord, in the exercise of its reasonable business judgment, deems desirable. In connection with such reletting, Tenant shall be liable for all costs of the reletting including, without limitation, rent concessions, leasing commissions, legal fees and alteration and remodeling costs.

*Id.* at 46. These costs are also among the remedies applicable to Tradewinds' non-payment of Rent and are included in the definition of Rent. Thus, Tradewinds was liable for the recovery, repair, and releasing costs associated with Ansons' re-entry as part of the Rent that became due upon re-entry. However, the court treated Tradewinds' "$1,070,062.97 in repairs and leasing costs" as if that amount were due in April 2022, even though that amount had not yet been incurred. *Id.* at 11. As above, we agree with Tradewinds that it became liable for these costs under Article 20(e) upon re-entry in October 2023, not upon its first breach in April 2022.

[30]     Further, even though Tradewinds was liable for the repair and releasing costs upon re-entry, those costs were not chargeable until they had been ascertained. Rent includes, in relevant part, "other amounts which Tenant . . . becomes obligated to pay[.]" *Id.* at 28. Although Anson's October 2023 re-entry triggered Tradewinds' obligation to pay the repair and releasing costs, the amounts were

not yet known. Thus, the amounts of each repair and releasing cost were chargeable to Tradewinds when and as they were incurred. They were not due as a single, cumulative cost before they were ascertained.

## B. Reletting Costs Amount

### 1. Rental Allowance

Tradewinds also challenges the trial court's inclusion of portions of the $1,070,062.97 total reletting costs. First, it challenges inclusion of the $695,992.50 rental allowance Anson gave to Rockwell, alleging the trial court erred in awarding the entire allowance. Although Tradewinds concedes "the Lease states it shall be liable for 'rent concessions'" under Article 20(e)(ii), it argues that rent concessions should be prorated because the balance of Tradewinds' Lease Term only overlapped two years of Rockwell's five-year lease term. Appellant's Br. p. 42.

But Article 20(e)(ii) accounts for this possibility, which provides that Anson may relet the Premises for a period that "may . . . be less than or exceed . . . the balance" of Tradewinds' Term. App. Vol. II p. 46. Further, it provides that Anson may "grant . . . concessions in reletting . . . in the exercise of its reasonable business judgment[,]" and that Tradewinds "shall be liable for all costs of the reletting including, *without limitation*, rent concessions . . . and alteration and remodeling costs." *Id.* (emphasis added). We find no ambiguity in the plain terms of this section: Tradewinds agreed that, upon its default, Anson was permitted to relet the Premises beyond the balance of Tradewinds'

Term and it would be liable for any rent concessions, such as the allowance it now disputes, without limitation. The trial court did not err in interpreting that the full amount of Rockwell's rental allowance was recoverable by Anson.

[33] Tradewinds does not separately challenge the amount of the allowance, but the total $695,992.50 allowance for Rockwell's improvements was within the scope of evidence before the court in any event. Anson's agent, Leah Fantin, testified that this was the amount allowed for Rockwell's improvements. Tr. Vol. II p. 44. And Anson's accounting ledger and Rockwell's Lease, both admitted at the damages hearing, reflect the total value of the allowance. Ex. Vol. I pp. 70, 101. The trial court did not abuse its discretion by awarding damages for the $695,992.50 allowance, which were included in the $1,070,062.97 total repair and leasing costs.

## 2. Commissions

[34] Also included in the $1,070,062.97 total repair and leasing costs, was $321,464.99 in commissions ($85,462.13 for Anson's broker and $236,002.86 for Rockwell's broker). Tradewinds contends the trial court erred in awarding recovery of these commissions. The payment of "leasing commissions" is plainly accounted for in Article 20(e)(ii). App. Vol. II p. 46. However, Tradewinds' argument here is that Anson presented no evidence it was obligated to pay commissions to the brokers because the "listing agreement between [Anson] and [Anson's broker] expired before Rockwell signed" its lease with Anson. Appellant's Br. p. 39. This argument is dispositive of this issue.

Indiana Code section 32-21-1-10 requires a "contract for the payment of any sum of money . . . as a commission or reward for the finding or procuring" of real estate to be in writing. Here, Anson had a written listing agreement with its broker, which provided that Anson would pay commissions to its broker and a tenant's broker in exchange for the brokers' procurement of a tenant to lease the Premises. *See* Ex. Vol. I pp. 109, 125. However, that writing expired on November 18, 2023, and Rockwell signed its lease on December 20, 2023.

Anson concedes that its "legal obligation to pay the leasing commission to its broker had expired prior to the entry of the lease with [Rockwell]" for the Premises. Appellee's Br. p. 24. We agree and conclude there is no evidence of an enforceable writing that required payment of commissions when Anson leased the Premises to Rockwell. Thus, there was no legal obligation for Anson to pay these commissions. Anson may have had a good business reason to pay the brokers in any event, but its decision to do so was voluntary and gratuitous. On these facts, that expense is not chargeable to Tradewinds. Because the trial court erred in concluding these commissions were recoverable, the $1,070,062.97 total repair and leasing costs must be reduced by $321,464.99.

## C. Mitigation of Damages

Tradewinds also contends the Court erred in interpreting Article 20(g) and, thus, in calculating the total Rent due post-breach. Article 20(g) provides:

> (g) Tenant shall also be liable to Landlord for all damages provided in law and under this Lease resulting from Tenant's breach including, without limitation, the difference between the

aggregate rentals reserved under the terms of this Lease for the balance of the Term together with all other sums payable hereunder as Rent for the balance of the Term, less the fair rental value of the Premises for that period determined *as of the date of such termination.*

App. Vol. II p. 47 (emphasis added). Although Tradewinds previously argued that all Rent should not have been accelerated from April 2022, Tradewinds now argues the trial court was required "to give Tradewinds credit for *the fair rental value* for the *entire* period (from April 2022 through February 2026)." Appellant's Br. p. 29 (emphasis in original). In its reply brief, Tradewinds contends that this section does contemplate acceleration of all Rent to the date of its first breach. We cannot agree.

[38]    First, the plain language indicates that Tradewinds is liable for all damages "resulting from" its breach; the provision says nothing about those damages being due and owing *upon* its first breach. App. Vol. II p. 47. Second, to configure the "fair rental value . . . as of the date of such termination[,]" there must have been a termination of the Lease in the first place. *Id.* Although it is mentioned elsewhere in its argument, Tradewinds apparently believes Anson "terminated the lease so it could rent the premises to Rockwell." Appellant's Br. p. 35. However, "reletting [of] the premises by the landlord will not constitute a surrender by operation of law." *Boonville Convalescent Ctr., Inc. v. Cloverleaf Healthcare Servs., Inc.*, 790 N.E.2d 549, 556 (Ind. Ct. App. 2003), *reh'g. on other grounds, trans. denied*. Indeed, "a surrender cannot be effected by the actions of only one party . . . [and] there must be some decisive, unequivocal act by the

landlord which manifests the lessor's acceptance of the surrender." *Id.* at 555-56 (quoting *Grueninger v. Lake Cty. Trust Co.*, 413 N.E.2d 1034, 1039 (Ind. Ct. App. 1980)).

[39] Here, the record is clear that Anson opted to re-enter the Premises without terminating the Lease. For example, in its August 2023 Default Notice, Anson asserted that Tradewinds' default allowed Anson to take immediate possession of the Premises "without such re-entry terminating the Lease." Ex. Vol. I p. 193 Then, in its August 2023 "Notice of Termination of Possession[,]" Anson expressly noted its demand for possession did not release Tradewinds from its obligations under the Lease. *Id.* at 198. In addition, the trial court's award of damages and judgment in favor of Anson was, in effect, a finding that Tradewinds did not prove Anson released it from liability under the Lease. *See e.g.*, *Four Seasons Mfg., Inc.*, 870 N.E.2d at 508. Tradewinds fails to direct us to an unequivocal act by Anson demonstrating its termination of the Lease and acceptance of surrender. Because the plain language of Article 20(g) is predicated on termination of the Lease and because there is no evidence that such a termination occurred, Article 20(g) does not apply to the calculation of damages in this scenario.

[40] That notwithstanding, Anson had a duty to mitigate damages, which was memorialized at Article 20(f) of the Lease. *Ind. Indus., Inc. v. Wedge Prod., Inc.,* 430 N.E.2d 419, 428 (Ind. Ct. App. 1982). "Where a party does mitigate its damages, the breaching party is entitled to set off the amount of damages mitigated." *Four Seasons Mfg., Inc.*, 870 N.E.2d at 507. Here, Anson mitigated

by reletting the Premises to Rockwell for part of Tradewinds' Lease Term, that is from February 2024 through February 2026. Tradewinds was entitled to have its Rent offset by the amount of Rockwell's anticipated rent for the overlapping period, and the trial court ultimately did so.

[41] However, the total damages the trial court awarded was significantly increased by delayed application of Anson's mitigating rental income. The "measure of damages is the loss actually suffered by the breach." *Id.* And the purpose of mitigation is to limit those damages, in part because "the non-breaching party is not entitled to be placed in a better position than he would have been if the contract had not been broken." *Id.* As we discuss below, the trial court awarded late fees for the entire balance of Tradewinds' Lease Term and interest on the cumulative balance through December 2024, all *before* reducing Tradewinds' cumulative damages by the amount of Rockwell's rent. Tradewinds therefore did not fully benefit from Anson's mitigation when and as such mitigation accrued.

[42] This cannot be correct. There must be some finality in the calculation of damages. We thus hold that a non-breaching party's mitigation must be applied to offset the breaching party's damages at the time the non-breaching party's mitigation becomes effective. In other words, because Anson's mitigation became effective on February 1, 2024, when Rockwell took possession and became obligated to pay rent for the Premises, *see* Ex. Vol. I p. 97, Tradewinds was entitled to have its damages offset at that time.

### D. Late Fees

Tradewinds also challenges the inclusion of late fees for each month of Rent owed from February 2024 through February 2026. Tradewinds contends Anson "should not be permitted to collect rent from Rockwell and impose a recurring, monthly late fee on Tradewinds over the same period." Appellant's Br. p. 37. Anson contends the late fees were permissible because the Lease was not terminated; but Anson's argument misses the mark.

Article 3(D) of the Lease provides, in relevant part:

> "In the event Tenant fails to pay Rent due under this Lease within five (5) days after the due date of said Rent, Tenant shall pay to Landlord a late charge of five percent (5%) on the amount overdue. Any Rent not paid when due shall also bear interest at the Default Rate."

App. Vol. II p. 28. The trial court added this 5% late fee to every month of Rent due from October 2023 through February 2026, then accelerated that Rent including the late fees. We have determined the trial court erroneously accelerated this total from April 2022; but we would face the same conundrum even if this amount had been properly accelerated from October 2023.

"A valid late fee in a lease is intended to compensate the landlord for both the administrative expense and inconvenience in collecting late rent and the loss of use of rental income." *Derr Enters., LLC v. Union City Ind. Properties, LLC*, 253 N.E.3d 1129, 1136 (Ind. Ct. App. 2025) (quoting *Gershin v. Demming*, 685 N.E.2d 1125, 1128 (Ind. Ct. App. 1997)).

> Such a late fee may also coincidentally serve as an incentive for the tenant to pay rent on a timely basis. Thus, to some extent, every late fee amounts to a 'penalty' for those tenants who fail to pay their rent in a timely manner. However, when a late fee provision is so substantial and burdensome as to compel compliance with the terms of the lease, rather than to compensate the landlord for the actual damages likely to result from the breach, the provision is not compensatory but punitive and is unenforceable as a liquidated damages clause.

*Gershin*, 685 N.E.2d at 1128 (footnote omitted).

[46] When we have previously confronted the validity of late-fee damages, the facts involved assessment of late fees after expiration or termination of a lease. For example, in *Gigax v. Boone Village Ltd.*, a trial court erred in assessing rent and late fees after the landlord terminated a lease early. 656 N.E.2d 854 (Ind. Ct. App. 1995). In *Gershin*, and later in *Derr Enterprises*, trial courts erred in assessing a daily late fee after the expiration of a lease term "because, by that time, actual damages could be ascertained, and the fee became a penalty rather than liquidated damages." 253 N.E.3d at 1136. In *Nylen v. Park Doral Apartments*, under a savings clause, tenants remained liable for rent as it accrued monthly and late fees were appropriately assessed through the natural expiration of a lease term. 535 N.E.2d 178 (Ind. Ct. App. 1989).

[47] Here, however, the trial court assessed a monthly late fee for future Rent and then accelerated the due date of that Rent which included prospectively assessed late fees. We are thus faced with a question similar to that in *Gershin*: i.e. whether there is any limitation on the usefulness of a late fee provision in a

commercial lease. As we concluded there, a late fee provision "is meant to compensate the landlord in liquidated damages for the late payment of rent." *Gershin*, 685 N.E.2d at 1129. A late fee is "the remedy prescribed by agreement for the breach that occurs when a rent payment is untimely" and "implies an expectation that the payment is forthcoming" despite its tardiness. *Id.* But, "a second breach occurs where, as here, the rent is not only late but also unpaid." *Id.* In *Gershin*, we concluded that, on those facts, "late payment becomes nonpayment when . . . the lease term ends, the tenants are no longer in possession of the premises, the rent remains unpaid, the parties no longer have a landlord-tenant relationship and the landlord has no further expectation of voluntary payment." *Id.*

In this case, the Lease was not terminated and had not naturally expired when the late fees were calculated. But, in October 2023, Anson re-entered and Tradewinds was no longer in possession of the Premises, and the Rent remained unpaid. And Anson had filed suit against Tradewinds for unpaid Rent and requested that a trial court calculate damages, demonstrating that it no longer expected voluntary payment. The effect of accelerating all post-re-entry Rent was to bring finality to the damages such that a trial court could determine a final award. When the Rent was accelerated, the landlord's damages for unpaid Rent were no longer uncertain or difficult to ascertain. *See id.* Thus, given the absence of an explicit provision to the contrary, we apply our holding in *Gershin* here. After re-entry and acceleration of rent, "when actual damages can be ascertained, 'late fees' for late payment of rent otherwise

assessable during the lease term as liquidated damages become a penalty[.]" *Id.* Once the balance due has been accelerated, the loss to the landlord is measured by the prejudgment interest on the unpaid balance, not by late fees. The trial court erred in assessing late fees for Rent accelerated from October 2023.

### E. Prejudgment Interest

Finally, Tradewinds asserts multiple errors in the trial court's calculation of prejudgment interest. "When the parties have contractually agreed to a rate of interest, that rate is used to compute the amount of prejudgment interest." *PNC Bank, National Association v. Page*, 186 N.E.3d 633, 638 (Ind. Ct. App. 2022). Tradewinds does not contest that the Lease provided for prejudgment interest at the "Default Rate" of eighteen percent per annum. App. Vol. II p. 28. Rather, Tradewinds challenges when interest attached to certain damages and the overall calculation of prejudgment interest.

"Prejudgment interest is computed from the time the principal amount was demanded or due[.]" *Fackler v. Powell*, 923 N.E.2d 973, 977 (Ind. Ct. App. 2010). Because we have concluded the trial court erred in interpreting certain provisions of the Lease, the dates that the principal amounts of damages were ascertained and became due have been corrected. Thus, re-calculation of interest in accordance with this opinion and our remand instructions below is necessary.

## Conclusion

We affirm the court's grant of partial summary judgment for Anson on the issue of Tradewinds' liability for breach of the Lease. However, we reverse the court's award of damages and remand for re-calculation of damages with the following instructions:

- For all Rent accrued prior to Anson's re-entry in October 2023, the balance of the Rent shall be calculated on a monthly basis, i.e., as each installment of unpaid Rent was incurred, and interest shall accrue at the Default Rate.

- All Rent owed and ascertainable from October 2023 through February 2026, excluding commissions and late fees, shall be calculated and added to Tradewinds' balance owed as of October 2023.

- Repair and releasing costs attributable to Anson's re-entry shall be added to Tradewinds' balance when and as such amounts are ascertained.

- Interest at the Default Rate shall continue to accrue until February 1, 2024.

- The total amount of Rockwell's rent shall be calculated and immediately deducted from Tradewinds' balance as of February 1, 2024.

- Calculation of interest at the Default Rate on Tradewinds' updated balance shall then resume and continue to accrue until the date of judgment. Post-judgment interest at the statutory rate shall then attach.

Affirmed in part, reversed in part, and remanded with instructions.

Brown, J., and Felix, J., concur.

ATTORNEY FOR APPELLANT

Alexander P. Pinegar
Church Church Hittle + Antrim
Noblesville, Indiana

ATTORNEYS FOR APPELLEE

Jenny R. Buchheit
Robert A. Jorczak
Christina L. Fugate
Adam M. Alexander
Ice Miller LLP
Indianapolis, Indiana